**PACIFIC HOMES, Inc., a Corporation, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 14732.**

United States Court of Appeals Ninth Circuit.

Feb. 21, 1956.

---

3. 2 Pollock and Maitland, History of English Law Before the time of Edward I, Ch. IX, § 3.

L. W. Wrixon, Carl R. Schulz, San Francisco, Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, C. Guy Tadlock, Sp. Assts. to Atty. Gen., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and LEMMON and CHAMBERS, Circuit Judges.

LEMMON, Circuit Judge.

The sovereign is not to be frustrated in the replenishment of its fisc by the fine-spun arguments advanced by the appellant. When the taxpayer itself, in its income tax returns, has repeatedly described its business as that of renting *and* selling homes; when it has developed a crafty technique whereby it can quicken its *sales;* when, in three other tracts, not here in issue, the appellant *sold* all its houses; when its board of directors formally ratified its previous *sales* and authorized future ones; when, in sum, the appellant has generally *sold* houses whenever it had the chance to do so, this Court will not set aside a judgment based upon careful findings that the appellant held its houses primarily for sale in the ordinary course of its business, and that therefore the profits derived from such sales were taxable as ordinary income and not as capital gain.

1. *Statement of Facts.*

The appellant, a California corporation, was organized on August 9, 1941, to engage in developing real estate subdivisions and renting and selling houses primarily to defense workers. The authorized capital stock consisted of 50 shares. After May 10, 1945, Ross H. Chamberlain was the sole stockholder.

The first subdivision developed by the appellant was "Homewood". Construc-

tion of 212 single-family dwellings there was completed about September 1, 1942. Thereafter, the appellant developed "Southwood", with 72 single-family dwellings completed about January 1, 1944, and "Shoreview", the construction of whose 63 single dwellings was completed about February 1, 1944.

All 212 houses in *Homewood* were initially rented to defense workers under leases containing options permitting the tenants to purchase the houses within 30 months. The Court found that this "was an effective sales device in that it created a ready-made sales market for those houses".

All the houses in *Southwood* and 56 of the houses in *Shoreview* were initially rented without purchase options in the leases. Seven of the *Shoreview* were sold immediately after construction, in the last three months of 1943.

In other words, *Homewood* was the only tract with purchase options in the leases.

In a resolution of December 9, 1943, the appellant ratified past sales of houses and authorized future sales.

From June, 1944, through April, 1946, 137 tenants in *Homewood* purchased houses under the options. From April, 1945, through August, 1946, the remaining 69 houses in *Homewood* were sold to persons without purchase options.

From April, 1945, to August, 1946, all 72 *Southwood* houses were sold, and from April, 1945, until July, 1946, all the remaining 56 *Shoreview* houses were sold.

Sales of houses in the three tracts were made during each of the tax years, and all houses were sold by the end of August, 1946. The District Court found that the sales were "frequent".

The appellant acquired three other tracts in its fiscal year ending May 31, 1946, and sold all its houses in such other tracts by the end of its fiscal year, May 31, 1947.

The appellant dissolved and went out of business on May 31, 1947.

Because of wartime and postwar demands, "The houses in effect sold themselves". "The absence of 'For Sale' signs had a sales motive, * * * to give prospective customers a sense of scarcity of available houses for sale and thereby make the house being sold seem more desirable."

Most of the sales were made by the appellant's "tract managers", whose efforts were supplemented by real estate brokers on commission.

The *Homewood* houses which were sold to tenants under purchase-options were held primarily for sale to customers in the ordinary course of the appellant's business "from the time the lease-option agreements were executed". The District Court found that the *Homewood* houses sold to persons without option to buy and the *Southwood* and *Shoreview* houses here in issue were held primarily for sale to customers in the ordinary course of business from the time the decision was made, prior to the sales in question, to sell all houses as they became vacant, including those not then subject to lease-option agreements.

The taxes in dispute were for corporate income and excess profits, were for the appellant's fiscal years ending May 31, 1945, May 31, 1946, and May 31, 1947, and totaled $141,041.48. The taxes were paid on February 3, 1948, and claims for refund were filed on September 8, 1949, and rejected in three notices in 1950 and 1951. The appellant brought an action in the court below for recovery of the taxes paid, on March 19, 1952.

The case was tried without a jury, and the District Court handed down a judgment in favor of the United States, from which judgment the present appeal has been taken.[1]

2. *The Question Presented.*

Was the District Court correct in holding that the houses involved were held

1. The judgment recites that the "complaint and the claims therein stated be and the same are dismissed", etc., but it is clear that the Court intended to render a final judgment on the merits after trial, in favor of the appellee.

primarily for sale in the ordinary course of the appellant's business within the meaning of Section 117(a) and (j) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a, j), and, accordingly, that the gain realized on their sale was subject to taxation as ordinary income.

The appellant's position is that the profits which resulted from its sales of defense housing were subject to the capital gains tax of 25% under Sec. 117(j). The appellee maintains that such profits should be taxed at ordinarily income and excess profits rates in the same manner as if the houses constituted property held by the appellant primarily for sale to customers in the ordinary course of its trade or business.

3. *The Applicable Statutes.*

The Internal Revenue Code of 1939:

"§ 22. *Gross income*

*(a) General definition.* 'Gross income' includes gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever * * *." 26 U.S.C.A. § 22.

"§ 117. *Capital Gains and Losses*

* * * * *

"*(a)(1) Capital Assets.* * * * means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer * * *.

"*(j)(1) Definition of property used in the trade or business.* * * the term 'property used in the trade or business' means * * * real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

4. *The Properties in Question Were Held by the Appellant Primarily For Sale in the Ordinary Course of Its Business.*

The appellant contends that its "original" intent was to hold the houses in question for rental purposes, and that this intention continued until the decision was made in May, 1945, when a decision to liquidate was made.

The District Court, however, found that the houses in the Homewood tract that were sold to tenants under options to buy were held primarily for sale to customers in the ordinary course of business from the time the lease-option agreements were executed; and that all the other houses in issue were so held "from the time the decision was made, prior to the sales in question, to sell all houses as they became vacant including those not then subject to lease-option agreements".

(a) *The Findings of the Trial Court Will be Accepted on Appeal If They Are Not "Clearly Erroneous".*

Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., contains the following sentence:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

██ As might be expected, this Court, in tax cases, has frequently applied a similar rule in assessing the weight to be given to decisions of the Tax Court. The weight accorded to District Court decisions, however, is the same as that given to those of the Tax Court; for 26 U.S.C.A. § 7482(a) provides in part as follows:

"*7482. Courts of review*

"*(a) Jurisdiction.*—The United States Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of Title 28 of the United States Code [not pertinent here], in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; * * * *"

For this reason, four very recent decisions of this Court, in reviewing holdings by the Tax Court, are peculiarly apposite.

In Stockton Harbor Industrial Company v. Commissioner, 9 Cir., 1954, 216 F.2d 638, 640, certiorari denied, 1955, 349 U.S. 904–905, 75 S.Ct. 581, 99 L.Ed. 1241, we said:

"Under the provisions of the Internal Revenue Code the scope of our review, except as provided in 28 U.S. C. § 1254, with which we are not concerned here, is stated to be:

"'* * * in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury'. 26 U.S.C. § 1141 [the predecessor of Sec. 7482, supra].

"In applying this provision, this court and other courts have held that it is not our function to retry questions of fact determined by *the trial court* upon conflicting evidence or even upon uncontradicted evidence where different inferences may reasonably be drawn from them. [Many cases cited.]" (Emphasis supplied.)[2]

(b) *Many Tests May Be Applied to Determine Whether the Real Property Was Held Primarily for Sale in the Ordinary Course of Business.*

██ There is no rule of thumb for the determination of whether property is held primarily for sale to customers in the ordinary course of business. We said in Stockton Harbor Industrial Company v. Commissioner, supra, 216 F.2d at pages 650–651:

"Courts have sought to evolve criteria by which to determine whether a person or an association was engaged in business. More particularly, they have tried to establish criteria by which to determine whether real property is held for investment or sale to customers in the ordinary course of business. Many tests have been proposed by this and other courts. Among them are: (1) the nature of the acquisition of the property, (2) frequency and continuity of sales over a period of time, (3) the nature and extent of the taxpayer's business, (4) the activity of the seller about the property, such as the extent of his improvements or his activity in promoting sales, (5)

**2.** See also ABC Brewing Corporation v. Commissioner, 9 Cir., 1955, 224 F.2d 483, 487; Ward v. Commissioner, 9 Cir., 1955, 224 F.2d 547, 550; and Homann v. Commissioner, 9 Cir., 230 F.2d 671, opinion by DENMAN, C. J. The point is so well settled that to multiply citations would be sheer pedantry.

the extent and substantiality of the transactions and the like. [Many cases cited.]

"But, in the last analysis, each case must be determined upon its own specific facts, for none of these incidences are present in all cases."

(c) *The Appellant's Own Witnesses and Records Compel the Conclusion That the Findings of the Court Below Were Not "Clearly Erroneous".*

Charles P. Mabey, a public accountant, testified that he reviewed the appellant's accounts, provided it with a "rent record" and a "list form", and prepared *all* of its Federal income and excess profits tax returns. Called as a witness for the appellant, Mr. Mabey on cross-examination stated that in the income tax return for the fiscal year ending May 31, 1945, he was responsible for the notation "Development of subdivision, renting and selling homes to defense workers", under the heading "Kind of business", and that if he put it there it was an accurate description of the business in which the appellant was engaged. Similarly, the "Kind of business" was given in the 1946 and 1947 returns as being "Development of Subdivision, Renting and *Selling* Homes", and for those returns, too, Mr. Mabey indicated that he was responsible. (Emphasis supplied throughout.) It will be remembered that the above three years are the crucial ones in the instant case.

The exhibits also show that in the income tax returns for the fiscal years ending May 31, 1942, and May 31, 1943, the "Kind of business" is given as "Construction and Sale of Defense Homes"; and for the fiscal year ending May 31, 1944, it is given as "Development of Subdivision—Renting and Selling Homes to Defense Workers".

▆▆ Furthermore, as we have seen, the appellant sold all of its houses in three other tracts, not here in issue, during 1946 and 1947. The appellant has accepted the District Court's finding on this point. Such other sales, too, have a probative value.

In Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709, 712–713, heavily relied upon by the appellant in its reply brief, the Court observed:

"Furthermore, if the owner was contemporaneously, or soon before or after, buying or selling other properties on his own account as a dealer, appellate courts have found that this evidence supported factual findings resulting in the denial of capital gain benefits with respect to the rental properties in question."

Another finding accepted by the appellant—save for a final sentence not relevant here—is to the effect that the absence of "For Sale" signs on the tracts "had a sales motive and was a deliberate sales technique of (appellant) to give prospective customers a sense of scarcity," etc. If the appellant was not bent on making sales, why all this Machiavellian subtlety?

Finally, the record shows that on December 9, 1943—several months before the appellant's alleged decision to "liquidate"—at a special meeting of the appellant's directors the chairman "stated that the corporation had sold and would in the future sell some of the homes owned by it, and that it would be advisable for the directors to ratify the execution of all documents that had heretofore been executed by the officers of this corporation with respect to sales heretofore made and to specifically authorize the execution of documents with respect to sales to be hereafter made". A resolution of ratification and authorization accordingly was unanimously adopted.

The action by the directors merely changed a *de facto* situation into a *de jure* one. It simply formalized what had been going on for years: the appellant was in the business of selling houses!

**5.** *The Motion for a Supplemental Record.*

 The appellant has made a motion and "suggestion" that this Court order a supplemental record on appeal. Attached to the motion are, *inter alia*, seven work sheets of the appellant's certified public accountant, showing, "among other things, the months when the houses at Homewood, Southwood and Shoreview were first rented under non-option leases". As an alternative, certain tabulations in the appellant's closing brief are offered. The latter already have been considered by us.

We have carefully examined the proffered documents, and we believe that the motion is both tardy and unnecessary. In view of the 174-page record, we think that the appellant has had ample opportunity to present its case, and we believe that it has done so.

Furthermore, we are of the opinion that throwing at the Court seven huge sheets of closely written words and figures would tend to obfuscate rather than to clarify the issues before us!

**6.** *Conclusion.*

 The appellant's first two income tax returns described its business as that of the "Construction and Sale of Defense Homes". Its subsequent returns gave its occupation as the "Development of Subdivision, Renting and Selling Homes".

In three other tracts, not here in issue, the appellant sold all its houses.

It developed a subtle sales technique to whet the appetites of prospective purchasers. Mr. Chamberlain, the appellant's sole shareholder after May, 1945, testified: "When things are hard to get people want them more than they do when they are easy to get."

Long before the appellant's alleged "decision to liquidate", its directors formally ratified the execution of all previous sales documents, and authorized the execution of documents with respect to future sales.

Taken in its entirety, the evidence is such that this Court is unable to say that the District Court's findings that the houses in issue were held primarily for sale, were "clearly erroneous".

On the ground that there is no need for a "supplemental record on appeal", the appellant's "motion and suggestion" that this Court order such a record is denied.

The judgment is affirmed.

DENMAN, Chief Judge (concurring).

The burden of proof is on the taxpayer to show that the sales of its land in the three fiscal tax years ending May 31, 1947, were incidents of a business of renting houses and were not the sale of its capital assets.

In this situation we are required to eliminate viva voce testimony in support of the taxpayer's contention, since the District Court, hearing the witnesses, must be assumed to have disbelieved it.

With regard to the Homewood tract where the houses were first leased for 30 months with an option to purchase and then leased for a year without option, and on finding this was less profitable than to sell them, taxpayer sold the houses, there is no question that the court properly held that the taxpayer had not sustained its burden of proof.

The houses in the Southwood tract were leased for a period between a year and a half and two years and it then appearing that the leasing was less profitable, the houses were sold in the sixteen month period between April, 1945 and August, 1946. The burden of proof here is that the sales over the sixteen months were but an incident of liquidating the business of renting. Eliminating the oral testimony to that effect, the District Court could infer that the taxpayer's burden of proof had not been maintained.

The sales in the Shoreview tract covered a similar period after a similar rental period and as to them the District Court also must be affirmed.