JOHN D. RILEY AND INEZ P. RILEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84881. Filed February 14, 1962.

*W. H. Albritton, Esq.*, for the petitioners.
*Homer F. Benson, Esq.*, and *Glen W. Gilson II, Esq.*, for the respondent.

OPINION.

TRAIN, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 84881 | 1956 | $2,058.77 |
| | 1957 | 1,257.30 |

The deficiency proposed for 1957 was assessed and paid.

The issues remaining for decision are:

(1) Whether the petitioners realized taxable gain when they conveyed 40 lots in the Lake Forest Subdivision to pay for work done by a firm of contractors; and

(2) If the transaction resulted in the realization of taxable gain, whether it was capital gain or ordinary income.

All of the facts have been stipulated and are hereby found as stipulated.

The petitioners John D. Riley (hereinafter sometimes referred to as John) and Inez P. Riley (hereinafter sometimes referred to as Inez) are husband and wife. Their Federal income tax return for 1956 was filed with the district director of internal revenue, Birmingham, Alabama.

In 1941, Inez acquired from her father, Andrew J. Preston, and the Federal Land Bank of New Orleans, an old farm or plantation known as the Knox Farm, which consisted of approximately 563 acres. The farm was made up of a pecan grove, cultivated lands, pasture lands, and swamp lands with an old abandoned millpond. From 1941 through 1945, the farm was operated for agricultural purposes. During that period of time it was difficult to secure farm labor or tenants. In 1944, petitioners began selling part of the farm. In that year 140 acres were sold to one purchaser. In 1945, another 90 acres were sold to a single purchaser.

On May 28, 1946, approximately 40 acres were subdivided and platted into lots. This property was known as Green Acres. The plat was recorded in the office of the Judge of Probate of Covington County, Alabama. Soon after the plat had been filed, Inez, joined by her husband, John, sold lots Nos. 1, 2, and 3 in block 2 of Green Acres for $750 each. Lots 2 and 3 were not paid for, were repossessed and subsequently sold again. Thereafter, petitioners entered into a contract with Lummus Auction Company (hereinafter referred to as Lummus Auction), Atlanta, Georgia, to sell the subdivided property at auction. In order to market the property, it was replatted as Green Acres on May 27, 1947, by dividing the lots in blocks 1 through 9, into 75-front-foot lots (except lots 1, 2, and 3 of block 2 which had already been sold) and by eliminating blocks 10 and 11 (later platted as Lake Forest Subdivision) from the plat entirely. On January 13, 1955, blocks 1, 2, and 3 of Green Acres were replatted and on December 22, 1955, blocks 8 and 9 were replatted.

On June 19, 1947, Lummus Auction offered Green Acres, as replatted, for sale at auction. The subdivision (consisting of 94 lots) was sold, but petitioners were distressed at the extremely low prices being bid. They had friends bid in 66 of the 94 lots, at the prevailing prices, for the purpose of computing the contract commissions of the auction company and to preserve the lots for subsequent sale at more favorable prices. During the remainder of 1947, two lots were sold out of Green Acres and another portion of the Knox Farm acreage, unplatted, consisting of 5 acres and 8 acres, was sold to individual purchasers.

On November 1, 1948, additional acreage of the Knox Farm was subdivided and platted. The plat consisted of three blocks adjoining blocks 4 and 5 of Green Acres. The newly platted lots were designated as Extension of Green Acres Subdivision (hereinafter referred to as Green Acres Extension). This plat was also recorded.

During the years 1948 through 1956, the following sales were made:

| Year | Green Acres (sales in lots) | Extension of Green Acres (sales in lots) | Knox Farm (sales in acres) |
| --- | --- | --- | --- |
| 1948 | 5 | 4 | |
| 1949 | 11 | 3 | |
| 1950 | 11 | None | |
| 1951 | 6 | None | 50 |
| 1952 | 11 and a portion of two others | 1 | 27 to one purchaser |
| | | | 34 to one purchaser |
| 1953 | None | 2 | 40 to one purchaser |
| 1954 | 2 | 2 | |
| 1955 | 3 and part of 4 others | 20 | |
| 1956 | 1 and part of 2 others | 2 | |

In addition to the aforementioned sales from the original Knox Farm, sales were made from other subdivisions known as the John D. Riley Subdivision and the Valley of Shilo Subdivision. Both of these subdivisions were owned by Inez.

There was an area on Knox Farm of approximately 70 acres which contained an old abandoned millpond. There was no existing means of entrance into this area. No lots had been sold out of this platted area, as it was not marketable as a subdivision in its then condition. In 1954, arrangements were begun to make this area marketable as a subdivision. A plat was prepared and the area was known as the Lake Forest Addition to the City of Andalusia, Alabama. Subsequently, block F of the Lake Forest Addition was resubdivided by a plat made on April 12, 1954. On April 24, 1954, petitioners and McDonald, Hooper & DeJarnette (hereinafter referred to as McDonald-Hooper) entered into a written contract for the subdivision, platting, grading, draining, and developing the subdivision. The pertinent parts of the contract are as follows:

This agreement made and entered into on this the 24 day of April, 1954, by and between INEZ P. RILEY and JOHN D. RILEY, parties of the first part; and W. B. McDONALD, M. S. HOOPER AND HENRY DeJARNETTE, INDIVIDUALLY AND AS PARTNERS, DOING BUSINESS AS McDONALD, HOOPER & DeJARNETTE, a partnership, hereinafter termed parties of the second part;

WITNESSETH:

WHEREAS, the parties hereto plan to develop a subdivision in the City of Andalusia, Alabama, known as LAKE FOREST,

AND WHEREAS, the parties of the second part agree to furnish the services, labor, materials and equipment necessary to make surveys, sub-divide, plat and record said sub-division, and the necessary services, materials, labor and equipment to grade, drain, develop and improve said sub-division and existing dam thereon, in the manner desired by the parties of the first part;

AND WHEREAS, the parties of the first part agree to furnish for said development the following described real estate, to-wit:

All of the SE¼ of NW¼ and the SW¼ of NW¼ of Section 21, T. 4, R. 16 E., lying and situated North of Midway Drive as shown and recorded in Green Acres Addition to the City of Andalusia, Alabama, and containing seventy acres, more or less.

Now THEREFORE, in consideration of the premises, and in further consideration of one dollar, in hand paid each to the other, the receipt whereof is hereby acknowledged, the parties hereto agree as follows:

1. The parties of the first part agree to;

(a) Furnish the land hereinabove described, free of all incumbrances at the agreed value of Twenty-Eight Thousand ($28,000.00) Dollars as their share of the development.

2. The parties of the second part agree to;

(a) Make surveys, sub-divide, plat and record said sub-division for the agreed sum of Eight Hundred and Forty ($840.00) Dollars.

(b) To furnish all storm drain pipe, and other incidental items of materials at invoice cost (plus freight and taxes, at actual cost).

(c) Furnish and construct all 4″ concrete aprons for spillways at dam for the price of 33¢ per square foot.

(d) To furnish the following pieces of construction equipment at the rental rates as shown below (each rental price to include operator & fuel) :

D-6 or D-7 Angledozer or Bulldozer_____ $10. 00 per hr.
Motor Patrol_____ 10. 00 per hr.
John Deere Tractor & Roller_____ 6. 00 per hr.
Power Shovel_____ 10. 00 per hr.
Dump Trucks_____ 2. 50 per hr.

(e) To furnish all construction labor (other than equipment operators) to clear and grub, laying of pipes and other incidental items required in the development, at the following price :

Foreman_____ $1. 50 per hr. plus 10% for taxes, ins. etc.
Semi-skilled_____ $1. 00 per hr. plus 10% for taxes, ins. etc.
Unskilled_____ $0. 75 per hr. plus 10% for taxes, ins. etc.

Total of A', B, C, D and E in this paragraph shall not exceed $12,000.00, unless hereafter amended in writing between the parties hereto; and the work done shall be as directed by the parties of the first part. It is further agreed that parties of the second part will furnish to the parties of the first part a statement of accrued costs of development each 30 days during the continuance of said work; and work may be terminated by parties of the first part at their discretion, and the value of all work assessed as of that date.

3. At the completion of said development or at the termination of work as hereinabove set forth, the total amount due the parties of the second part is to be added to the $28,000.00 contribution of the parties of the first part; and from this combined sum the true equity of each is to be ascertained. When said equities are established, the parties hereto will jointly inspect and establish a wholesale value for each and every lot in said sub-division; said values, in their aggregate, to equal the combined total of the $28,000.00 due the parties of the first part and the amount due the parties of the second part under this agreement.

4. When said values are established and lots numbered, the number and value of each lot will be placed on a separate slip of paper, and all of the slips of paper placed in a container in the presence of each of the parties hereto and a party selected by the parties hereto. The parties of the second part will then and there, in the presence of the others, draw from the container a sufficient number of lots (of an aggregate value) equal to the amount due the parties of the second part under this agreement; and the parties of the first part will forthwith execute and deliver a warranty deed to said drawn lots, to the parties of the second part. *It being the intention of this agreement to establish a method whereby work done by the parties of the second part can be paid for with a portion of the developed property.* [Emphasis supplied.]

On May 31, 1955, paragraph 2 of the contract was amended by providing that the cost of the work done by McDonald-Hooper would not exceed $14,000.

Pursuant to the contract as amended, the work of subdividing, platting, surveying, grading, draining, developing, and improving the property was done by McDonald-Hooper. The work was completed on January 13, 1956. Upon completion of the work, the value of the work done by McDonald-Hooper was determined to be $14,000. Pursuant to the provisions of the contract, the lots as subdivided were then valued. After the valuation of each of the lots in accordance with the total aggregate value, 40 lots were set aside for and conveyed

to McDonald-Hooper and 80 lots were retained by Inez. Of the remaining lots, one was sold in 1956 and two were sold in 1957. The proceeds of such sales were reported as ordinary income in the returns filed for such years.

Inez did not have a real estate license. At all times pertinent to the issue under consideration John was a licensed real estate dealer and handled the sales of all parcels of real estate sold by Inez.

In the notice of deficiency respondent made the following determination regarding the transaction with McDonald-Hooper:

It is determined that you realized ordinary income in the amount of $9,333.33 from the transaction whereby you exchanged lots in Lake Forest Subdivision for improvements made to lots in said subdivision which were retained by you, computed as follows:

| | |
|---|---|
| Value of improvements received on lots retained | $9,333.33 |
| Basis of lots exchanged | None |
| Gain | $9,333.33 |

Accordingly, your taxable income is increased in the amount of $9,333.33 for the taxable year ended December 31, 1956. Sections 61, 1221 and 1011 of the Internal Revenue Code of 1954.

In their Federal income tax return for 1956, petitioners treated the transaction as a sale or exchange of a capital asset held for more than 6 months and reported the gain as capital gain. The following business schedule from petitioners' 1956 return indicates their treatment of other items of income and expense:

JOHN D. & INEZ P. RILEY

ANDALUSIA, ALA.

REAL ESTATE, AGENCY

"SALES OF LOTS IN DEVELOPED REAL ESTATE SUBDIVISIONS"

*1956*

INCOME
  SALES:

| | | |
|---|---|---|
| 4 Lots in John D. Riley Subdivision | $775.00 | |
| 4 Lots in Green Acres Subdivision | 1,900.00 | |
| 1 Lot in Lake Forest | 1,100.00 | |
| 15 Lots in Valley of Shilo | 4,750.00 | |
| 1 Lot on Watson St.—Misc | 300.00 | |
| 2 Houses repossessed—Misc | 2,400.00 | |
| Total | | $11,225.00 |

COST OF SALES:

| | | |
|---|---|---|
| 4 Lots in John D. Riley Subdivision | 600.00 | |
| 4 Lots in Green Acres | 1,110.24 | |
| 1 Lot in Green Acres | 159.49 | |
| 15 Lots in Valley of Shilo | 2,135.10 | |
| 1 Lot on Watson St | 250.00 | |
| 2 Houses—Repossessed and sold | 1,900.00 | |
| Total | | 6,154.83 |

| | |
|---|---:|
| Gross Profit on Sales | $5,070.17 |
| Appraisals—Commissions of Land Sales | 4,543.00 |
| | |
| Total Gross Income | $9,613.17 |

Expenses:

| | | |
|---|---:|---:|
| Commissions paid to others | 793.00 | |
| Taxes | 204.00 | |
| Appraisals Expenses | 200.00 | |
| Interest Paid | 1,050.00 | |
| Automobile Expense & travel | 751.00 | |
| Rent, Lights, Telephone—Office | 837.00 | |
| Promotion—Entertainment | 105.00 | |
| Accounting Fees | 50.00 | |
| | | |
| Total Expense | | 3,990.00 |
| | | |
| Net Profit for Year | | $5,623.17 |

### *Issue 1.*

Petitioners conveyed 40 lots in the Lake Forest Subdivision to McDonald-Hooper for work done on the subdivision. The issue to be decided is whether petitioners realized a taxable gain.

Petitioners contend that the transaction with McDonald-Hooper was merely an addition to capital and a nontaxable event. We see no merit in this contention.

Section 1001(a) of the 1954 Code[1] provides that the gain from "the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011." Section 1001(b) provides that "The amount realized" is the sum of "any money received plus the fair market value of the property (other than money) received." Literally, where there is a disposition of real estate for services,[2] no property or money is received by the one disposing of the real estate. However, in similar circumstances, it has been held that "money's worth" is received and that such receipt comes within section 1001(b). *International F. Corp.* v. *Commissioner*, 135 F. 2d 310 (C.A. 2, 1943), affirming 45 B.T.A. 716 (1941); *United States* v. *General Shoe Corporation*, 282 F. 2d 9 (C.A. 6, 1960), certiorari denied 365 U.S. 843 (1961). Since the petitioners received a *quid pro quo*, the transaction resulted in a closed transaction with a consequent realized gain. By virtue of section 1002,[3] the entire amount of the gain is to be recognized.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise specified.

[2] The contract dated April 24, 1954, provided that it is "the intention of this agreement to establish a method whereby [the] work done by [McDonald, Hooper & DeJarnette] can be paid for with a portion of the developed property."

[3] SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

938

## Issue 2.

Having decided that petitioners realized a taxable gain, the remaining issue is whether it was ordinary income or capital gain. The answer to this question is dependent upon whether the lots conveyed to McDonald-Hooper were held primarily for sale to customers in the ordinary course of petitioners' trade or business or for investment. If the lots were held primarily for sale to customers, then section 1221(1) of the 1954 Code[4] would exclude the lots from the classification of capital assets and the gain would be ordinary income rather than capital gain.

The issue is one of fact, *D. L. Phillips*, 24 T.C. 435 (1955), and there is no one determinative test. The many cases that turn on this issue have set forth certain factors to be considered. *C. E. Mauldin*, 16 T.C. 698 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). Some of these factors are the taxpayer's purpose in acquiring, holding, and disposing of the property, the activities of the taxpayer, or those acting either with him or on his behalf with respect to the improvement and actual disposition of the property, the frequency and continuity of sales, and the extent of advertising to promote sales or lack of such. But each case rests on its own facts and in most instances it is unlikely that all factors will be applicable or of the same weight that they might have in another factual background. See *C. E. Mauldin, supra; Gamble* v. *Commissioner*, 242 F. 2d 586 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court; *Consolidated Naval Stores Company* v. *Fahs*, 227 F. 2d 923 (C.A. 5, 1955). While the purpose for the acquisition must be given consideration, intent is subject to change, and the determining factor is the purpose for which the property is held at the time of sale or exchange. *Carl Marks & Co.*, 12 T.C. 1196 (1949); *Richards* v. *Commissioner, infra; Mauldin* v. *Commissioner, supra; Raymond Bauschard*, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960); *Eline Realty Co.*, 35 T.C. 1 (1960).

Petitioners have pointed out that the Knox Farm was owned by Inez and that the sales were always handled by her husband, John. They argue that since she was not conducting any business, the property could not be held primarily for sale to customers in the ordinary course of *her* trade or business.

There is no merit in petitioners' contention. It is an accepted principle of law that one may conduct a business through agents,

---

[4] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

    (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

and, although others may bear the burdens of management, the business is nonetheless his. *Walter H. Kaltreider*, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958); *Achong* v. *Commissioner*, 246 F. 2d 445 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; *Fackler* v. *Commissioner*, 133 F. 2d 509 (C.A. 6, 1943); *Snell* v. *Commissioner*, 97 F. 2d 891 (C.A. 5, 1938); *Richards* v. *Commissioner*, 81 F. 2d 369 (C.A. 9, 1936). There is no doubt that John was handling Inez' property as her agent; therefore, any activity engaged in by John, relating to her property, can be imputed to her.

Petitioners have suggested that they were merely liquidating the Knox Farm. It is true that one may liquidate an asset in the most advantageous way and still obtain capital gains treatment. *Galena Oaks Corporation* v. *Scofield*, 218 F. 2d 217, 220 (C.A. 5, 1954). However, petitioners have failed to show that this was what they were doing. Even assuming they had, a taxpayer is no less in the real estate business simply because his objective is to liquidate property than he would be if his objectives were something else, if his activities with respect to the property amount to the conduct of the real estate business. *Frieda E. J. Farley*, 7 T.C. 198 (1946); *Achong* v. *Commissioner, supra.*

In 1956, the year before us, more than 50 percent of petitioners' income was derived from sales of Inez' property. In their Federal income tax return for 1956, petitioners' business schedule was headed:

JOHN D. & INEZ P. RILEY

ANDALUSIA, ALA.

REAL ESTATE, AGENCY

"SALES OF LOTS IN DEVELOPED REAL ESTATE SUBDIVISIONS"

It is settled that statements of this nature (self-description of business or occupation) constitute evidence of a taxpayer's business. *Kaltreider* v. *Commissioner*, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957); *White* v. *Commissioner*, 172 F. 2d 629 (C.A. 5, 1949); *Pacific Homes* v. *United States*, 230 F. 2d 755 (C.A. 9, 1956).

There were sales in every year from 1944 through 1957. In addition to subdividing and selling lots out of the Knox Farm, there was similar activity in connection with two other subdivisions (Valley of Shilo and John D. Riley Subdivisions) owned by Inez. Just how, when, and under what circumstances these latter two subdivisions were acquired is not shown by the present record. We do know that in 1956, four lots in the John D. Riley Subdivision and 15 lots in Valley of Shilo Subdivision were sold. The extent to which any of this property was advertised or promoted is unknown, but this must weigh against the petitioners since the burden of proof is on

them. On the basis of the record before us, we are satisfied that petitioners were carrying on a real estate business.

Petitioners contend that even if they were real estate dealers, this does not mean that the transaction under consideration must necessarily be treated as a sale to customers in the ordinary course of business. They contend that they may occupy a dual role; that of dealers and investors. We agree with petitioners' contention as a statement of what the law is. However, the burden of proof is upon the petitioners to show that the property was held for investment.

Petitioners' main argument is set forth in the following excerpt from their brief:

we are concerned with the conveyance by Petitioners of a portion of the swamp lands and old abandoned mill pond, *intended* for sale as a subdivision (in connection with the general liquidation of the investment in "Knox Farm"), but which was *"not marketable* as a subdivision *in its then condition"*. The transaction between Petitioners and the Contractors and Engineers was for the very purpose of making the property involved in the transaction *marketable as a subdivision.* We are still at a loss to understand the Commissioner's idea that property which is *not marketable in its then condition,* conveyed to Contractors and Engineers in connection with arrangements and work to *make it marketable,* constitutes a sale or exchange of property *"held primarily for sale to customers in the ordinary course of business"*. * * * [Emphasis in original.]

We see no merit in petitioners' position. Petitioners seem to be laboring under the misapprehension that marketability "in its then condition" is a touchstone for decision. They have apparently confused their case with cases such as *Eline Realty Co., supra,*[5] and *Charles E. Mieg,* 32 T.C. 1314 (1959).[6] Those cases involved unusual pieces of property that were not capable of subdivision or development and had, possibly, a single potential purchaser. In the instant case, petitioners' only problem was one of having work done so the property could then be sold in accordance with their desires. Furthermore, the Lake Forest Subdivision property was admittedly intended for sale. McDonald-Hooper improved and subdivided the property so

[5] *Eline Realty Co.,* 35 T.C. 1, involved an odd-shaped lot which was regarded as useless unless the land adjoining it was subdivided at some time in the future. Its limited size and narrow dimensions made subdivision, development, or construction unfeasible. Unable to use the lot for subdivision and development, the taxpayer realized that there would be only one probable use and only a single potential purchaser. The taxpayer's only real hope rested in the possibility that at some future time the owner of the adjoining 22-acre tract would subdivide. We held that although the property of which this lot was a part was acquired for the purpose of subdividing and developing, subsequent events changed the purpose for which it was held from one of sale to one of investment.

[6] In *Charles E. Mieg,* 32 T.C. 1314, the taxpayer sought to buy certain property for subdivision purposes. Part of the land was located on the back side of a mountain and could not be economically subdivided for resale. The owner of the property insisted on selling all of the property or none of it. The taxpayer purchased all of the property. Subsequently, the mountain property was sold and the question arose as to whether it was held for sale or investment. We held "that the rapid increase in value of such parcels was attributable to the location of a country club nearby, and that the original intention accompanying the venture's acquision of such mountain land was to hold it for an extended period as an investment with the hope that an ultimate enhancement in value would provide the opportunity for profitable disposition."

that it could be sold in lots. The conveyance took place *after* the work was done and at a time when, even under petitioners' theory, the property was marketable and salable.

It is also to be noted that in 1956 other sales from the Lake Forest Subdivision were treated as sales from developed real estate subdivisions. The gain from these sales was reported as ordinary income. Although it is stipulated that petitioners do not necessarily agree with this treatment, no satisfactory explanation for this treatment has been given.

A simple illustration discloses the fallacy inherent in petitioners' theory. A brick manufacturer, owning its own clay deposits, pays its workers in bricks rather than cash. Under petitioners' theory, this would be either a contribution to capital or the gain would be capital gain on the basis that the clay was not marketable as bricks and the bricks were not sold to customers. Obviously, this is not the law.

Merely by showing that additional work was required before the property in question could be sold as a subdivision or that it was exchanged rather than sold fails to satisfy petitioners' burden of proving the property was held for investment. Accordingly,

*Decision will be entered under Rule 50.*