HENRY T. and LOIS P. SIMONSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. JOHN B. WOODWARD and VERONE WOODWARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Simonson v. Commissioner
Docket Nos. 3941-73, 3942-73.
United States Tax Court
T.C. Memo 1975-12; 1975 Tax Ct. Memo LEXIS 363; 34 T.C.M. (CCH) 47; T.C.M. (RIA) 750012; January 15, 1975, Filed Louis F. Nawrot, Jr., *364 Barry E. Wolf, and DeWitt Williams, for the petitioners. Robert J. Chicoine, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined deficiencies in the Federal income taxes of petitioners Simonson and petitioners Woodward for 1970 of $19,160.28 and $6,647.00, respectively. The issue for decision is whether petitioners must recognize gain on their transfer of stock to Mergers and Acquisitions, Inc. All of the facts and exhibits in this case were fully stipulated and are incorporated herein by this reference. Petitioners Henry T. and Lois P. Simonson are husband and wife who resided in Seattle, Washington, at the time of the filing of their petition with this Court. (Hereinafter Simonson will refer only to Henry T. Simonson.) They timely filed a joint Federal income tax return for 1970 with the Western Service Center, Ogden, Utah. Petitioners John B. and Verone Woodward are husband and wife who resided in Kirkland, Washington, at the time of the filing of their petition with this Court. (Hereinafter Woodward will refer only to John B. Woodward.) They timely filed a joint Federal income tax return for 1970 with *365 the Western Service Center, Ogden, Utah. As of July 1, 1969, there were 1,353 shares of common stock of Anderson and Thompson Ski Company (hereinafter A&T) issued and outstanding, of which Simonson owned 928 shares (68.5 percent) and Woodward owned 425 shares (31.5 percent). Simonson was president and Woodward was vice president of A&T. During 1969, Simonson and Woodward (hereinafter sometimes referred to as petitioners) decided actively to seek opportunities whereby A&T might merge, consolidate, or otherwise combine with, or be acquired by, another corporation. On July 1, 1969, a Letter Agreement (hereinafter the letter agreement) was entered into between A&T and Mergers and Acquisitions, Inc. (hereinafter M&A). The letter agreement, drafted by Stanley Foster Reed (hereinafter Reed), president of M&A, while in the offices of A&T, provides in relevant part as follows: 1 July 1969 Mr. Stanley Foster Reed, President Mergers and Acquisitions, Inc. 1725 K Street N.W. Washington, D.C. 20006 Dear Stanley: In accordance with our recent discussions we wish to appoint you our exclusive agent to develope [sic] potential candidates for merger, consolidation, acquisition or other *366 form of corporate combining under the following terms and conditions: * * * * * Payment for your services will be effected in the following manner. * * * * * 4. We will pay you $2,000 per month plus reasonable out-of-pocket expenses for a period of six months. 5. Whould [sic] we effect, within two years of the termination date of this contract, a merger, consolidation acquisition or other form of corporate combining with any company wiht [sic] whom you have initiated discussions during the course of this contract, we will pay you, in cash or in kind at our election, 5% of the first million dollars of consideration, 4% of the second million, 3% of the third, 2% of the fourth and 1% of the balance less any sums paid to you under para. 4 above. * * * * * Anderson and Thompson Ski Company /s/ Henry T. Simonson Henry T. Simonson, President Following the execution of the letter agreement, M&A commenced looking for corporations with which A&T might merge, consolidate, or otherwise combine, or which might acquire A&T. As a result of this search, M&A located Fuqua Industries, Inc. (hereinafter Fuqua), which was interested in acquiring all of the outstanding shares *367 of A&T. Negotiations, in which Fuqua, Simonson, Woodward, and Reed participated, led to the exchange on March 4, 1970 of 216,777 shares of common stock of Fuqua for all of the outstanding stock of A&T owned by petitioners. This exchange was made pursuant to an Agreement and Plan of Reorganization dated February 12, 1970 and signed by Fuqua and by Simonson and Woodward. Relevant parts of the Agreement and Plan of Reorganization provide: The Stockholders [petitioners] desire to transfer to Fuqua, and Fuqua desires to acquire, all the issued and outstanding capital stock (the "Acquired Stock") of Anderson and Thompson Ski Co., Inc. a Washington corporation ("A&T"), being the only issued and outstanding capital stock of A&T, solely in exchange for shares of Common Stock, $1 par value, of Fuqua ("Fuqua Common Stock"). NOW, THEREFORE, in consideration of the premises and mutual covenants herein, the parties hereto agree as follows: 1. Plan of Reorganization.Fuqua and the Stockholders hereby adopt a Plan of Reorganization relating to A&T pursuant to the provisions of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended, to be effectuated *368 in the manner hereinafter set forth. 2. Transfer of Stock. Upon the terms and subject to the conditions set forth in this Agreement, the Stockholders agree to assign, transfer and deliver to Fuqua at the Closing (as defined in Section 4) all the Acquired Stock * * *. 3. Consideration. (a) In consideration of the assignment, transfer and delivery of the Acquired Stock to Fuqua as provided herein, Fuqua shall * * *: (i) at the Closing issue and deliver to the Stockholders 216,777 shares of Fuqua Common Stock (the "Initial Stock"); and (ii) from time to time pursuant to Section 3(c), issue and deliver to the Stockholders Additional Stock * * *. * * * * * 15. Expenses; Finders' Fees. Each party shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby. Fuqua agrees to indemnify the Stockholders against any claims of third parties for brokerage commissions or finders' fees in connection with the transactions contemplated hereby in so far as such claims are alleged to be based on arrangements made by Fuqua, and the Stockholders agree to indemnify Fuqua against any such claims in so far as they are alleged to be based *369 on arrangements made by A&T or the Stockholders. The Stockholders agree to pay any fee due Stanley Foster Reed for his services in connection with the transaction contemplated herein. The Fuqua shares were issued to petitioners in proportion to and in exchange for their A&T shares, Simonson receiving 148,683 shares and Woodward receiving 68,094 shares. Of the 216,777 shares of Fuqua common stock, 54,193 shares (approximately 25 percent) were registered with the Securities and Exchange Commission (hereinafter SEC) and 162,584 shares (approximately 75 percent) were not so registered. Of the 162,584 unregistered shares, 54,193 (approximately 25 percent) were restricted as to alienability for a period of one year and 108,391 (approximately 50 percent) were restricted for a period of two years. Prior to the actual exchange of the stock, Simonson and Woodward, or persons acting on their behalf, requested that Fuqua consider issuing a portion of the 216,777 shares of stock to M&A. Fuqua, however, refused to issue stock directly to M&A, since it was neither obligated to nor connected with M&A and it did not wish to incur any risk of possible jeopardy to the tax-free nature of the corporate *370 reorganization. On March 4, 1970, petitioners proposed to assign to M&A 6,950 shares of Fuqua common stock in satisfaction of their obligation under the letter agreement. Of the 6,950 shares, 1,737 were to be registered and 5,213 were not to be. The 5,213 unregistered shares were to bear a legend precluding transfer of the stock until certain dates in the future. M&A objected to this proposal. Commencing on March 4, 1970 and ending on or about March 13, 1970, negotiations took place between M&A, on one hand, and petitioners, on the other, over the number of shares of Fuqua common stock to be received by M&A and the number of such shares which would be registered. M&A wanted the shares receivable by it to be registered. Since the number of shares to be received by M&A, whether all or a portion were registered, could not be calculated without an agreement or finding on the value of the 216,777 Fuqua shares, the negotiations included the subject of the proper valuation of such shares. On March 13, 1970, petitioners reached agreement with M&A to assign, and did assign, to M&A 5,850 shares of Fuqua common stock; 4,012 were assigned by Simonson and 1,838 were assigned by Woodward. All *371 of the shares assigned to M&A were registered with the SEC. This settlement was reflected in a Receipt and Agreement dated March 16, 1970 and signed by Simonson, Woodward, Reed, and M&A (by its president, Reed). Its relevant parts provide: BACKGROUND
A. On July 1, 1969, a letter agreement was executed by Anderson & Thompson Ski Co., Inc. (hereinafter "A&T") and delivered to M&A. Simonson and Woodward then owned all the outstanding stock of A&T. It was and is the intention of all the parties hereto that A&T have no obligation or liability whatsoever under the terms of such letter agreement, where, as has occurred, the compensation for a corporate combination, as described in the letter agreement, is received directly by the stockholders of A&T. * * * * * * * * THEREFORE, IT IS AGREED: 1. M&A shall, in full payment and satisfaction of the commission, payable by reason of the issue of the initial stock to Simonson and Woodward under the reorganization agreement, reduced by the advances against commission paid M&A in accordance with paragraph 4 of the letter agreement, receive certificates representing five thousand eight hundred fifty (5,850) shares of Fuqua common *372 stock, and M&A so acknowledges the receipt of said certificates in full satisfaction and payment of the amount so due it. The value of the initial stock, for the purposes of establishing the commission payable to M&A on the initial stock hereunder and of establishing future commissions payable if further consideration, if any, in the form of additional stock is paid Simonson and Woodward by Fuqua, has been established by agreement of the parties at $3,048,390.00. * * * * * 5. This agreement supercedes [sic] the letter agreement, and unless this agreement is invalid, the letter agreement shall be of no further force or effect, except to the extent it establishes commission rates, which rates are incorporated and carried forward herein. A&T shall have no obligation or liability to M&A whatsoever, either under this or the letter agreement (all its obligations under the letter agreement being those of Simonson and Woodward), and, upon performance of this agreement, any and all obligations of Simonson or Woodward, or either of them, to M&A in any way relating to the merger and acquisition of stock in A&T by Fuqua shall be satisfied and at an end. There is no real dispute between *373 the parties as to the underlying facts herein. They part company on the interpretation to be accorded these facts. Petitioners assert that what occurred was a nontaxable exchange between them and M&A to the extent of 5,850 shares out of the total number of shares delivered by Fuqua. Respondent counters with the assertion that petitioners delivered the 5,850 shares to M&A as payment of a commission due the latter and that this constituted a taxable transaction giving rise to long-term capital gain. [1] We hold for respondent. We believe it to be clear that, from the beginning of negotiations, the only obligation to M&A belonged to petitioners. The letter agreement (see p. 3, supra) specifically states "we will pay you, in cash or in kind at our *374 election" (emphasis added) and was signed by Simonson as president of A&T. [2] Entering the picture after petitioners incurred this potential obligation, Fuqua was careful to avoid its assumption or payment. In paragraph 15 of the Agreement and Plan of Reorganization (p. 5, supra), it was specifically provided that petitioners agreed "to pay any fee due Stanley Foster Reed for his services in connection with the transaction." In addition, after petitioners requested it to consider issuing a portion of the 216,777 shares directly to M&A, Fuqua refused on the grounds that it was neither obligated to nor connected with M&A. Petitioners had complete discretion as to whether to pay the obligation in cash or in Fuqua stock. They chose the latter. When a dispute arose over the stock payment to M&A, *375 discussion centered on two subjects: (1) whether the shares due M&A were to be registered and (2) the value of the 216,777 Fuqua shares. The parties have stipulated that the latter subject was discussed because "the number of shares to be received by M&A * * * could not be calculated without an agreement or finding on the value of the 216,777 Fuqua shares." We believe it is fair to conclude from these facts that, once agreement was reached on M&A's rights to registered stock and the value of such registered stock, the only thing left was to compute under paragraph 5 of the letter agreement the amount of the obligation owed M&A. Petitioners then paid them with an appropriate number of registered Fuqua shares. The fact that M&A rejected the unregistered stock offer and insisted on registered shares further supports the view that the shares were cash equivalents. Having found that petitioners had an obligation to M&A and satisfied that obligation with Fuqua stock received in the reorganization exchange, it is clear to us that the payment to M&A was a "sale or exchange" and that petitioners must recognize gain under section 1001. United States v. Davis,370 U.S. 65 (1962); *376 International F. Corp. v. Commissioner,135 F.2d 310 (C.A. 2, 1943); United States v. General Shoe Corporation,282 F.2d 9, 12 (C.A. 6, 1960); J. K. Downer,48 T.C. 86 (1967); John D. Riley,37 T.C. 932, 937 (1962), affirmed per curiam, 328 F.2d 428 (C.A. 5, 1964); E. F. Simms,28 B.T.A. 988, 1030 (1933). See Aitken, "Handling Reorganization Expenses: Accounting and Legal Fees, Brokerage or Finder Fees, etc.; Who Pays the Bills," 30th Ann. N.Y.U. Tax. Inst. 1053, 1059-1960 (1972). Beyond the foregoing, petitioners could not prevail even if we were to adopt their view of the transaction. Clearly (as petitioners concede, see Reply Brief, p. 7) any rights which M&A acquired did not become measurable until the closing with Fuqua on March 4, 1970. It cannot be gainsaid that, at the very least, a taxable event occurred at that time by way of a transfer of the right to receive a portion of the Fuqua shares by petitioners to M&A as compensation for services. Thus, even if we were to accept petitioners' argument that there was no preexisting obligation to M&A, petitioners would have realized *377 a capital gain on that date, which is within the same taxable year involved herein. J. K. Downer,supra.The fact that petitioners' obligation to set over a portion of the Fuqua shares to M&A was an obligation to be satisfied in kind rather than a discharge of a monetary amount is of no consequence. United States v. Davis,supra;John D. Riley,supra.To be sure, there is a gap between the March 4, 1970 date and the March 13, 1970 date, when delivery of the shares to M&A actually took place, which conceivably could involve a difference in the value of the Fuqua shares, but we have no evidence of any such difference and, accordingly, the value placed upon those shares by petitioners and M&A would control. [3]
Petitioners have virtually staked their entire case *378 on Silberberg v. United States,174 F. Supp. 31 (S.D. Cal. 1959) (reported in full, 3 A.F.T.R. 2d 1597). In Silberberg, the district court had before it only the year 1946 and only the issue of Harry Cohn's basis in the 24,219 shares of Columbia Pictures Corporation common stock with which he was left after the compromise agreement and transfer to Samuel Briskin of 1,000 such shares. The transfer to Briskin occurred eleven years prior to 1946 and the court never had to face the question of whether Cohn's transfer gave rise to recognizable gain. It merely recited that Cohn and the Government had agreed, during the final settlement of Cohn's 1935 tax return, to treat the transfer to Briskin as involving no income or realizable gain to Cohn in 1935. 3 A.F.T.R. 2d at 1602, par. IX, Conclusions of Law. Accepting this, the court's only job was to determine Cohn's basis in the remaining 24, 219 shares. Consistent with the 1935 transaction's treatment, they attributed the $500,000 cost to the net number of shares Cohn retained. Since we have held that the transfer herein by petitioners to M&A was a "sale or exchange" on which petitioners *379 realized gain which must be recognized, we find Silberberg to be distinguishable and without precedential value on the basis question. Similar analysis distinguishes A. D. Morton,6 B.T.A. 1295 (1927), cited in Silberberg.[4]
Decisions will be entered for the respondent.
Footnotes
1. Respondent does not question the treatment of the transaction between petitioners and Fuqua as a reorganization within the meaning of section 368(a)(1)(B)↩, with the result that he included the holding period of petitioners' A&T stock in computing the period during which they held their Fuqua stock. See section 1223. All references herein are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.
2. It is arguable that Simonson signed the letter agreement in his capacity as president of A&T and, hence, that "we" refers to A&T, but such an argument has not been made by petitioners and would, indeed, be of no help to them here. Moreover, the Receipt and Agreement (pp. 7,8 supra↩) states that, under the final agreement, the parties did not intend A&T to be obligated to M&A.
3. Petitioners make an argument that such valuation was rooted in 1969 calculations rather than the $18.75 price of the Fuqua stock on the N. Y. Stock Exchange in March 1970, but we have no probative evidence to support the assertion. In any event, we note that a per share calculation of value based on 216,777 shares and a $3,048,390 value of A&T comes within pennies of $18.75.↩
4. Both Silberberg and Morton can be viewed in the context that a taxable transaction occurred at the time the underlying transaction was consummated (in 1932 in Silberberg and in 1914 in Morton↩). Under these circumstances, the value, at that time, on a per-share basis, of the "carved out" shares would be equal to the value of the shares retained, so that there would be an equivalent offset of the amount to be excluded in the first instance from the basis of the shares retained and then added to the basis of the retained shares as an additional cost by way of a commission, which is precisely the treatment accorded by respondent to petitioners' retained shares, some of which were sold to third parties during the taxable year involved herein.