Stanley H. Klarkowski and Estate of Susan Klarkowski, Deceased, Richard H. Thomas, Executor, et al. [1] v. Commissioner. Klarkowski v. Commissioner
Docket Nos. 3778-62 - 3780-62, 436-65 - 439-65.
United States Tax Court
T.C. Memo 1965-328; 1965 Tax Ct. Memo LEXIS 2; 24 T.C.M. (CCH) 1827; T.C.M. (RIA) 65328; December 30, 1965
*2 1. Character for tax purposes of various real estate transactions determined - whether profit was ordinary income or capital gain. 2. Exchange of improved rental real estate for unimproved real estate to be used for subdivision purposes held not to qualify for nonrecognition of gain under section 1031, I.R.C. 1954. 3. Payments made in settlement of reopened bankruptcy proceeding held not deductible. 4. Amount of deductions for business use of automobile and club dues and charges determined. Jackson L. Boughner, 39 S. LaSalle St., Chicago, *4 Ill. , for the petitioners. George G. Young, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts following: Docket
No.
Petitioner
Year
Deficiency
3778-62
Stanley H. Klarkowski
437-65
and Estate of Susan
Klarkowski, Deceased, Richard H. Thomas, Executor
1957
$ 897.75
1958
676.79
1959
2,601.75
1960
7,598.48
1961
3,042.92
1962
5,136.66
3779-62
Richard H. Thomas and
436-65
Estate of Mary S. Thomas, Deceased, Richard H.
1957
9,831.31
Thomas, Executor
1958
12,316.34
1959
31,356.57
1960
17,163.81
1961
13,816.01
1962
10,426.52
3780-62
Mildred D. Hall
1957
1,206.73
438-65
1958
822.27
1959
394.16
1960
624.80
1961
686.62
439-65
Bernard J. Korzen and Loretta Korzen
1960
6,332.24
1961
3,429.01
1962
4,546.81
Certain issues raised in the pleadings have been settled by agreement between the parties, and other issues have been conceded on brief; these adjustments will be reflected in the Rule 50 computation. *5 The issues remaining for decision in these consolidated proceedings are: (1) Whether certain property and interests in certain property sold by petitioners during the taxable years in question constituted property held primarily for sale to customers in the ordinary course of a trade or business so that the profit therefrom was taxable as ordinary income rather than capital gain, and also whether the exchange of rental property on St. Charles Road for cash and 66 acres of vacant land qualifies as a nontaxable exchange pursuant to section 1031, I.R.C. 1954; (2) whether petitioner Richard H. Thomas is entitled to a deduction, as an ordinary and necessary business expense, for certain payments made in compromise of litigation involving the reopening of a bankruptcy proceeding in which he was the bankrupt; and (3) whether Richard H. Thomas and Mildred Hall, as members of the partnership Thomas & Associates, are entitled to a deduction for certain automobile and club expenses. Findings of Fact Some of the facts have been stipulated and are found accordingly. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this *6 reference. During the years 1957 through 1962, Stanley H. Klarkowski (hereinafter referred to as Klarkowski) and Susan Klarkowski, husband and wife residing in Hinsdale, Ill., filed joint income tax returns for such years with the district director of internal revenue, Chicago, Ill. Susan Klarkowski died on July 22, 1963, and Richard H. Thomas duly qualified as executor of her estate. Klarkowski was a judge of the Circuit Court of Cook County, Chicago, Ill., until his retirement from that post in 1951. Richard H. Thomas (hereinafter referred to as Thomas) and Mary Thomas, husband and wife residing in Hinsdale, Ill., filed joint income tax returns for the taxable years 1957 through 1962 with the district director of internal revenue, Chicago, Ill. Mary Thomas died on December 16, 1962, and Thomas duly qualified as executor of her estate. Thomas had been connected with the real estate business in one capacity or another for a number of years prior to 1952. He holds a real estate broker's license. He also engaged in other business activities during the years here involved, entirely unrelated to real estate. Mildred D. Hall (hereinafter referred to as Mildred) filed individual income *7 tax returns with the district director of internal revenue, Chicago, Ill., for the taxable years 1957 through 1961. Bernard J. Korzen (hereinafter referred to as Korzen) and Loretta Korzen, during the years 1960 through 1962, were husband and wife residing in Chicago, Ill. They filed joint income tax returns for each of such years with the district director of internal revenue, Chicago, Ill. Korzen is a brother-in-law of Klarkowski, is an attorney, was clerk of the Probate Court of Cook County from 1954 to 1958, and is presently treasurer of Cook County. During the years 1957 through 1962, Thomas & Associates was a partnership consisting of Thomas and Mildred with its principal place of business being at 222 West Adams Street, Chicago, Ill. For the years 1957 through 1962, Thomas & Associates filed partnership returns with the district director of internal revenue, Chicago, Ill. In June 1952, Thomas, Klarkowski, and Mac L. Alkire (hereinafter referred to as Alkire) joined as equal members in a joint venture known as Robinhood Ranch and Building Project (hereinafter referred to as the Robinhood Ranch partnership) and filed partnership information returns for the taxable years *8 1953 through 1962 with the district director of internal revenue, Chicago, Ill. On October 31, 1958, Thomas, Klarkowski, and Korzen joined as equal members in a joint venture known as Glendale Developers. For the taxable years 1959 through 1962, Glendale Developers filed partnership information returns with the district director of internal revenue, Chicago, Ill. Issue 1. Real Estate Transactions (a) Sale of Lots in Robinhood Ranch Development - Hinsdale, Ill. In 1952, Alkire, vice president of Republic Realty Mortgage Corporation, directed Thomas' attention to a 21-acre tract of land then known as the Robinhood Ranch Riding Stable, located near Hinsdale, Ill. The property had three houses, a large barn, horse barn, garage, and polo field. Alkire mentioned to Thomas that he was interested in acquiring the property for the purpose of establishing a personal residence there. Thomas visited the property, was enthusiastic about its possibilities, and showed the property to Klarkowski who also indicated an interest in building a personal residence there. Accordingly, the three individuals purchased the property on May 8, 1952, for $85,000; and on June 15, 1952, title to the property *9 was transferred to a real estate trust at the Oak Park National Bank, Oak Park, Ill., known as trust No. 2656. Each of the joint ventures held an undivided one-third beneficial interest in this trust. They allocated $80,000 of the purchase price to the land and buildings on it and the remaining $5,000 was allocated to the riding stable business and the horses. In December 1952 they started disposing of the horses and the stable business. In early 1953 the joint venturers constructed a road into the property and later subdivided the land into 27 lots. Alkire selected the lot improved by the main dwelling as his personal residence. Klarkowski acquired his personal lot in 1954, had a house constructed on this lot, and has lived there up until the time of trial. The joint venturers had four houses built on the property by Borg & Sons, a Chicago builder, to establish the character of the property. During the latter part of 1953 and throughout 1954 and 1955, the Robinhood Ranch partnership permitted various builders, on a lot-by-lot arrangement, to enter upon the property and construct houses. When the completed houses were sold to ultimate homeowner-purchasers, title to the property *10 passed directly from trust No. 2656 to the homeowner-purchaser. The lots were not advertised generally for sale. Alkire was the individual primarily responsible for the sale of the lots. On April 27, 1956, Robinhood Ranch partnership entered into a letter agreement with Borg & Sons under which the latter was to have the right to enter upon, and construct homes on, lots 21 and 22 in the Robinhood Ranch development. The agreement provided in part as follows: In accordance with our verbal discussions, it is understood * * * that you are to have the right to construct residential buildings from plans, mutually acceptable to yourselves and us, on Lots 21 and 22 in Robin Hood Ranch Subdivision. It is further understood that when the buildings so constructed have been sold, or at such time before as you may see fit, you will pay to us the sum of $7,500 for Lot 21 and $9,500.00 for Lot 22. In the event you desire to acquire additional lots from time to time, we will be glad to enter into a similar arrangement with you for them at the following prices: Lot 1
$ 8,000.00
Lot 3
9,000.00
Lot 4
9,000.00
Lot 6
9,000.00
Lot 8
13,500.00
Lot 9
12,000.00
Lot 20
12,000.00
*11 If this is in accordance with your understanding, please so signify by signing one copy of this letter and returning to us. It was decided that individual septic tanks would be installed rather than construct a sewerage system. The contractor, Borg & Sons, would construct a house on a particular lot without first obtaining legal title to the property, legal title to the property being transferred from trust No. 2656 to the purchaser when the house was sold. At the end of 1956 there were 10 lots remaining unsold. In 1958, Thomas purchased his personal lot at cost, constructed a house, and he has lived there up to the time of trial. On its partnership information returns the Robinhood Ranch partnership reported sales of lots in Robinhood Ranch subdivision, gross receipts from sales, total costs, and gross profit from the sale of these lots, as follows: 1954
1955
1956
Number of lots sold
5
6
4
Gross receipts
$146,250.00
$150,778.25
$118,188.43
Total costs
131,251.04
113,847.82
85,644.52
Gross profit
14,998.96
36,930.43
32,543.91
1957
1958
1960
1962
Number of lots sold
1
1
2
2
Gross receipts
$12,000.00
$3,435.27
$17,000.00
$22,500.00
Total costs
3,435.27
3,435.27
6,886.29
8,038.34
Gross profit
8,564.73
10,113.71
14,461.66
*12 No lots in this subdivision were sold in 1959 and 1961. The partnership returns for the years 1954 through 1959 reported the principal business activity of the partnership to be subdividing and selling property, or words to that effect; indicated that considerable sums of money were spent on improvements to the property; reported gain on the sale of lots in both the Robinhood and Glenview subdivisions as ordinary income; and showed the unsold lots as inventory items on the balance sheets attached to the returns. The partnership returns for the years 1960, 1961, and 1962 reported gain on the sale of lots as capital gain, and reported the principal business activity of the partnership to be investment in real estate. The lots in Robinhood Ranch subdivision sold in the years here involved were held by the taxpayers primarily for sale to customers in the ordinary course of their business. (b) Sale of Lots in Glenview Woodlands (Southern Tract) Early in 1955, Hubert F. Nelson (hereinafter referred to as Nelson), a real estate broker and developer doing business in the suburban Chicago area, showed some farmland to Thomas which was for sale at that time. On August 8, 1955, Thomas, *13 Klarkowski, and Alkire, operating in their capacity as Robinhood Ranch partnership, acquired approximately 57 acres contained in this parcel of farmland located in Glenview, Ill., at a cost of $70,000. During July and August 1955, this property (hereinafter referred to as Glenview Woodlands) was deeded into trust No. 2656 at the Oak Park National Bank. Glenview Woodlands is divided into two portions by the Chicago and North Western Railroad tracks and right-of-way which passes through the north section of the property. The portion lying south of the railroad right-of-way, known as the southern tract, contained approximately 43 acres of land. The portion lying north of the railroad right-of-way, known as the northern tract, contained approximately 14 acres of land. Glenview Woodlands was bordered on two sides by paved highways; Glenview Road on the south and Pfingston Road on the east. At the time of purchase by Robinhood Ranch partnership the area within which Glenview Woodlands was situated was very active in residential building and home construction. In late 1955 a group of landowners in the suburban Glenview area known as the "Combined Developers" held meetings to discuss construction *14 of sewers, that would connect with an interceptor sewer, on their properties. Thomas, Klarkowski, and Nelson attended some of these meetings. Joseph E. Wahrer (hereinafter referred to as Wahrer), doing business in 1956 as Glen Castle Homes and Castlewood Estate, had been engaged in the building and construction of residential homes in the Chicago area since 1945. At one of the meetings of the "Combined Developers" Nelson introduced Thomas to Wahrer and together they discussed the prospect of erecting homes and developing the Glenview Woodlands property. Ultimately Thomas, Klarkowski, and Alkire agreed with the "Combined Developers" to pay their share of the expenses involved in extending sewer systems into the Glenview Woodlands property. On April 3, 1956, an application was filed by the Oak Park National Bank as trustee under trust No. 2656 for rezoning of the southern tract of Glenview Woodlands from F (farming) to R-4 (residences - 10,000-square-foot lots). On May 16, 1956, a plat of subdivision for the southern portion of Glenview Woodlands was filed with the zoning board of appeals of Cook County. The plat, which was approved on July 11, 1956, divided the southern tract of *15 Glenview Woodlands into 121 individual lots. At the hearing before the zoning board Thomas appeared as a witness and testified in support of the application for rezoning, and the efforts of the partners in attempting to have the southern tract of Glenview Woodlands rezoned were successful. On June 27, 1956, Thomas, Klarkowski, and Alkire, doing business as Robinhood Building Project, entered into an agreement with Wahrer, doing business as Glen Castle Homes and Castlewood Estates, to sell lots 1 to 8, inclusive, to Wahrer at a total price of $28,000 ($3,500 per lot). Under the agreement, Robinhood Building Project was to complete all improvements, including surfacing the roadways, providing sanitary and storm sewers, and providing water and sewer stubs to each individual lot, and, upon completion of the above transaction, was to submit complete bids for the cost of all improvements required, for the purpose of determining any adjustment in the selling price for remaining lots, for which Wahrer was to have the first right of purchase or refusal. On November 13, 1956, Thomas, Klarkowski, and Alkire entered into a second agreement, wherein they are identified as "joint adventurers *16 doing business under the name of Thomas & Associates and also as Robin Hood Building Project," as sellers, for the sale of an additional 10 lots to Wahrer then doing business as Glen Castle Homes & Wahrer Construction, at a price of $4,000 per lot. It was also agreed that Wahrer was to continue operations, to contract and build additional homes during 1956 and the spring of 1957, and was to submit offers to purchase additional lots if he so desired. After Wahrer had constructed a home in the Glenview Woodlands subdivision and the lot was sold to the ultimate homeowner-purchaser, then the beneficiaries of trust No. 2656 would issue a letter of direction to the trust directing that a deed be issued to the homeowner-purchaser, and title to the lot never vested in Wahrer. Nelson was paid a 10-percent commission by the Robinhood Ranch partnership on all lots sold from the southern tract of Glenview Woodlands although there was no formal written agreement providing for such payment. By the end of 1960 all 121 lots in the southern tract of Glenview Woodlands had been developed and sold. The number of lots sold from the Glenview Woodlands subdivision and the gross receipts, costs, and *17 gross profits reported by the partnership from such sales were as follows: 1956
1957
1958
1959
1960
Number of lots sold
9
41
34
36
1
Gross receipts
$32,000.00
$162,500.00
$139,000.00
$173,400.00
$5,500.00
Costs
25,472.30
119,763.65
99,369.95
104,584.65
2,932.80
Gross profit
6,527.70
42,736.35
39,630.05
68,815.35
2,567.20
A statement of land and development costs attached to the partnership returns reflected land costs of slightly over $70,000 and development costs, including rezoning, sewers, water, paving, etc., of about $264,000. The lots in the southern tract of Glenview Woodlands subdivision during the years here involved were held by the taxpayers primarily for sale to customers in the ordinary course of their business. (c) Sale of a One-Fourth Interest in Glenview Woodlands (Northern Tract) On January 16, 1958, the Oak Park National Bank as trustee under trust No. 2656 filed an application for rezoning the northern 14 acres of Glenview Woodlands from F (farming) to R-4 (residences - 10,000-square-foot lots). A subdivision plat was submitted dividing the property into 37 lots. The rezoning was approved on May 15, 1958, but *18 before the tract could be developed the county adopted a comprehensive rezoning ordinance which rezoned the tract to F. The trust thereupon reapplied for rezoning the property to R-4, and was successful, the property being rezoned to R-4 on August 15, 1960. In 1962 the Robinhood Ranch partnership sold a one-fourth interest in the northern tract of Glenview Woodlands to Korzen for $9,000, and reported a gain of $6,500 on the sale as long-term capital gain. Before this tract could be developed it was necessary to build a grade crossing over the railroad to obtain access thereto. None of the lots in this tract was sold during the years before us. The entire tract was later sold to a third party. The one-fourth interest in the northern tract of Glenview Woodlands subdivision sold to Korzen was not property held by the taxpayers primarily for sale to customers in the ordinary course of their business. (d) Exchange of St. Charles Road Property for 66 Acres of Vacant Land In the latter part of 1958, Nelson approached Thomas and asked whether he would be interested in exchanging some real estate Thomas owned for 66 acres of vacant land in Glenview then owned by Ernest C. Wentcher *19 (hereinafter referred to as Wentcher). Thomas visited this 66-acre tract with Nelson and together they investigated the land, discussing its relative value. This property was located a short distance to the north of the Glenview Woodlands property. Thomas individually owned property located at 4212 St. Charles Road, Bellwood, Ill. (hereinafter referred to as the St. Charles Road property), which property was improved with a building under lease to the Jewel Tea Co. Title to this property was held by the Oak Park National Bank as trustee under trust No. 3355, Thomas being sole beneficiary of this trust. On October 31, 1958, Thomas, Klarkowski, and Korzen entered into a joint venture agreement under the name "Glendale Developers." Under the agreement Thomas was given a power of attorney to negotiate for the purchase of the 66 acres owned by Wentcher at a price not to exceed $205,000. Title to the 66 acres was to be placed in trust No. 3355 with Klarkowski and Korzen each acquiring a one-third beneficial interest therein. On November 12, 1958, Thomas and Wentcher entered into an agreement for the exchange of the St. Charles Road property owned by Thomas for $10,000 in cash and the *20 66 acres of vacant land owned by Wentcher. At the time of the exchange the St. Charles Road property was encumbered by a mortgage in the amount of $116,000, while the 66-acre tract owned by Wentcher was unencumbered. Upon the exchange Wentcher paid Thomas $10,000 cash, assumed the $116,000 mortgage on the St. Charles Road property, and transferred the 66-acre tract to Thomas free of encumbrances. Thomas and Klarkowski then gave Wentcher an installment note in the face amount of $116,000 secured by their beneficial interest in various properties. Korzen assumed one-third of the $116,000 obligation. On October 20, 1960, Thomas, Klarkowski, and Korzen amended their joint venture agreement dated October 31, 1958, by providing that in the event the tax basis of the 66-acre tract of land was less than $205,000, any gain on the disposition of this property occasioned by the basis being less than $205,000 was to be allocated on the partnership return to Thomas. On February 13, 1959, Klarkowski, Thomas, and Korzen, operating under the name of Glendale Developers, created trust No. 4560 at the Oak Park National Bank. These three individuals were equal beneficiaries under trust No. 4560 *21 and title to the 66 acres of vacant land in Glenview was transferred to this trust. On his 1959 income tax return Thomas reported the exchange of the St. Charles Road property as a tax-free transaction. The exchange was reflected on the return as follows Basis at March 1, 1959: Land
$52,211.09
Building
$129,466.50
Less: Depreciation
29,556.39 [1]
99,910.11
$152,121.20
Exchanged for 66 acres of vacant land
215,000.00
having a fair market value of
Gain - Not recognized at this time
$ 62,878.80
Note: Gain of $62,878.80 used to redue
152,121.20
the basis of the 66 acres acquired in the
exchange - Basis of 66 acres
In the notice of deficiency issued to Thomas respondent determined that the transaction was a taxable exchange and resulted in longterm capital gain in 1959, which the parties have stipulated is $55,066.87. The parties further agreed by stipulation that the $10,000 in cash received on the exchange was taxable in 1959. The 66 acres received by Thomas in exchange for the St. Charles *22 Road property was acquired primarily for sale. (e) Sale of a Two-Thirds Interest in 160 Acres Located in Glenview, Ill. On June 5, 1959, Klarkowski, Thomas, and Korzen, operating as Glendale Developers, purchased 94 acres of additional vacant land in Glenview for $233,500. The additional 94 acres adjoined the 66-acre tract acquired from Wentcher and title to the property was placed under trust No. 4560. The three joint venturers made a downpayment of $59,000 and gave back a purchase money mortgage of $174,500, payable over 3 years. Nelson, who helped arrange purchase of the 94-acre tract, approached Ralph Markus, Jr. (hereinafter referred to as Markus), and discussed the possibilities of developing the combined 66- and 94-acre tracts for residential housing. At the time of acquisition the combined 66- and 94-acre tracts (160 acres) were zoned R-3 (requiring 20,000-square-foot lots) and Markus was interested in the property only if the property could be rezoned R-4 (10,000-square-foot lots). On June 10, 1959, Oak Park National Bank as trustee under trust No. 4560, entered into an agreement with Markus, doing business as Everbilt Construction Co. (hereinafter referred to as *23 Everbilt) for the sale of the 66-acre tract acquired from Wentcher for a purchase price of $297,000, a deposit of $10,000 being made upon execution of the agreement. The agreement provided that both parties would use their best efforts to have the land rezoned to R-4. In the event rezoning could not be obtained by May 1, 1960, Everbilt had the option to cancel the contract and be repaid the $10,000 deposit. On the same date, June 10, 1959, Everbilt was granted an option to purchase the adjoining 94-acre tract for a purchase price of $423,000, the option being exercisable after December 15, 1959, and on or before January 15, 1960. This agreement was likewise conditioned upon rezoning of the 94 acres to R-4. The agreement between Everbilt and trust No. 4560 dated June 10, 1959, provided that the seller assumed responsibility for obtaining an extension of the water main to the southwest corner of the 160-acre tract. Efforts to rezone the 160-acre tract to R-4 were unsuccessful and the deposit of $10,000 was returned to Everbilt on or about May 1, 1960. Although the rezoning application instituted by trust No. 4560 was authorized by letter from the beneficiaries Klarkowski, Thomas, and *24 Korzen, the proceedings before the zoning board were actually conducted by an attorney employed by Markus. Payments on the mortgage encumbrancing the 160-acre tract constituted a larger burden than the three partners had initially anticipated and they were anxious to find a satisfactory manner in which this continuing obligation could be reduced, if possible. In early April 1960, the partners in Glendale Developers talked to Edward J. Shannon, owner of a lumber company, concerning the possible acquisition by him of a part interest in the entire 160-acre tract. Shannon then contacted his attorney, Frederick W. Turner, Jr. (hereinafter referred to as Turner), who visited the property. It was tentatively agreed that Turner and Shannon would acquire a two-thirds interest in the entire 160-acre tract. Subsequently Turner interested another client of his, John A. Nugent (hereinafter referred to as Nugent), in sharing a one-half interest in the one-third interest Turner was then planning to acquire. On April 13, 1960, Thomas wrote Turner a letter informing him that Glendale Developers was interested in participating in a syndicate with Turner, Nugent, and Shannon to the extent of a one-third *25 interest. Thomas proposed to sell a two-thirds interest in the property for a purchase price of $480,000, 25 acres to be deeded upon signing of the contract and thereafter 1 acre to be deeded for each $4,500 paid. The $480,000 purchase price was to be paid over a period of 3 years. On May 31, 1960, an agreement was executed by the Oak Park National Bank as trustee under trust No. 4560 (referred to in the agreement as seller) and Thomas, Klarkowski, Korzen, Shannon, Turner, and Nugent (referred to in the agreement as buyers) under which the trustee as seller agreed to sell the full 160-acre tract for a price of $720,000 payable in installments over a 3-year period. Under this agreement the buyers' obligation was to pay a portion of each installment of the purchase price, such portion being: Thomas
one-ninth
Klarkowski
one-ninth
Korzen
one-ninth
Shannon
one-third
Nugent
one-sixth
Turner
one-sixth
On the same date, May 31, 1960, Thomas, Klarkowski, Korzen, Turner, Shannon, and Nugent executed a separate agreement providing that a new trust would be created at the LaSalle National Bank of Chicago, with Thomas, Klarkowski, and Korzen each having a one-ninth *26 interest, Shannon a one-third interest, and Nugent and Turner a one-sixth interest each. As the purchase price was paid, title would be transferred to the new trust. The 160-acre tract is divided by the Chicago and Northwestern Railroad. The part lying west of the railroad was composed of approximately 114 acres and the remaining 46 acres lie east of the railroad tracks. In June 1960 the beneficiaries of the LaSalle bank trust employed counsel and commenced proceedings to have the 114 acres rezoned to R-4, and in November 1960 commenced proceedings to have the tract lying east of the tracks rezoned to restricted manufacturing use. In early 1961 rezoning of the eastern tract was successfully concluded. However, the zoning board of appeals declined to rezone the western tract to R-4 and the parties were forced to appeal the decision of the board to the Supreme Court of Illinois to obtain the requested rezoning. They were successful in this effort and the western tract was rezoned to R-4 in late 1963. The record of the rezoning proceedings indicated that the applicants planned to develop the 114-acre tract with single family dwellings and to cause all utilities to be installed. Sometime *27 after the property was acquired the beneficial owners agreed with Wahrer that if the property was rezoned to R-4 Wahrer would have the option to construct the houses. Subsequently Wahrer decided the project was too big for him to handle and the 114-acre tract was sold as one tract to a builder in 1964. Also in 1964 Thomas formed a corporation, Industrial Sites, Inc., which purchased the tract east of the railroad. On their returns filed for the years 1960 through 1962, Klarkowski, Thomas, and Korzen each reported gain on the sale of a part interest in the 160-acre tract as long-term capital gain. Respondent determined that the gain on the sale was properly reportable as ordinary income. The two-thirds interest in the 160-acre tract in Glenview sold to the Shannon group in 1960 was not properly held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business. Sales by Thomas & Associates
Thomas & Associates reported the following on its partnership information returns for the years 1957-62: 1957
1958
1959
Management fees
$ 5,362.18
$ 5,904.22
$ 5,293.74
Lease commission
Sales commission
965.00
780.00
Insurance commission
2,075.41
2,152.93
1,989.79
Miscellaneous income
589.04
504.68
3,567.06
Total
$ 8,026.63
$ 9,526.83
$11,630.59
Deductions
17,865.33
17,554.50
17,855.14
Net profit (loss)
[9,838.70)
[8,027.67)
[6,224.55)
Sale of property [1]
14,186.44
16,288.36 [2]
2,503.31 [3]
Net balance
$ 4,347.74
$ 8,260.69
[3,721.24)
*28 1960
1961
1962
Management fees
$ 5,230.42
$ 5,188.14
$ 7,627.48
Lease commission
5,000.00
12,164.47
Sales commission
100.00
300.00
505.00
Insurance commission
3,207.55
3,175.89
4,355.84
Miscellaneous income
290.82
28.67
16.10
Total
$13,828.79
$20,857.17
$12,504.42
Deductions
19,062.20
18,604.88
19,152.89
Net profit (loss)
[5,233.41)
$ 2,252.29
[6,648.47)
Sale of property [1]
4,251.24
3,921.77 [4]
Net balance
$ (982.17)
$ 6,174.06
[6,648.47)
(f) Sale of Mobile Avenue Lot On August 13, 1956, Thomas & Associates acquired a vacant lot *29 located on the southeast corner of 55th and Mobile Avenue, Chicago, Ill. (hereinafter referred to as the Mobile Avenue lot). Thomas & Associates, operating at the request of the High-Lo Stores, was attempting to assemble a city block for the purpose of constructing a supermarket. After acquisition of this first lot they immediately encountered an obstacle preventing completion of the contemplated acquisition, and it was impossible to acquire the adjoining lots. The Mobile Avenue lot was sold by Thomas & Associates on March 6, 1957. The property had never been listed with a real estate broker. On the partnership return filed by Thomas & Associates for the taxable year 1957 the gain of $2,784.86 realized from the sale of the Mobile Avenue lot was reported as long-term capital gain. In the notices of deficiency issued to Thomas and Mildred, respondent determined that the gain realized from the sale of this lot was "properly reportable as ordinary income" under the provisions of section 61 of the Internal Revenue Code of 1954. The Mobile Avenue lot was not property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business. *30 (g) Sale of Six Lots Located on Butterfield Road On January 24, 1955, Thomas & Associates acquired six vacant lots located at the northwest corner of Butterfield Road and Geneva in Bellwood, Ill. (hereinafter referred to as the Butterfield Road lots). At the time of acquisition it was intended that this property would be used for the construction of a supermarket to be leased to the Jewel Tea Co. The Jewel Tea Co.'s real estate committee subsequently decided, after completion of a neighborhood survey, that the store should be located near St. Charles Road rather than Butterfield Road, so Thomas & Associates acquired the necessary property on St. Charles Road and constructed a store at that location. The Butterfield Road lots were sold by Thomas & Associates on March 6, 1957, to a major oil company for $21,000 resulting in a gain of $4,030.46, which was reported as long-term capital gain. The property was never advertised for sale or listed with a broker. Thomas & Associates never placed a "For Sale" sign on the property. In the notices of deficiency issued to Thomas and Mildred, respondent determined that the gain realized on the sale of this property was properly reportable *31 as ordinary income. The Butterfield Road lots did not constitute property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business. (h) Sale of Washington Boulevard Property On December 19, 1955, Thomas & Associates acquired a parcel of vacant land located at the northeast corner of 24th Street and Washington Boulevard in Bellwood, Ill. (hereinafter referred to as the Washington Boulevard property). This parcel was initially purchased with the plan that apartment buildings would be constructed thereon, but this idea was subsequently abandoned. The Washington Boulevard property was not listed for sale with a broker, nor were "For Sale" signs placed on it. In 1957 a broker approached Thomas & Associates and inquired as to the availability of this property. The property was sold to a client represented by this broker on April 22, 1957, for $11,900 resulting in a net gain of $3,748.14, which was reported as long-term capital gain. In the notices of deficiency issued to Thomas and Mildred, respondent determined that the gain realized from the sale of this property was properly reportable as ordinary income. The Washington Boulevard *32 property was not property held primarily for sale to customers in the ordinary course of a trade or business. (i) Sale of 10 Acres Known As Millner Farm On January 13, 1955, Thomas & Associates acquired a parcel of land containing approximately 10 acres, known as the Millner Farm, near Wheaton, Ill. At the time of acquisition Thomas was interested in building a barn on the property and raising Shetland ponies; however, it was subsequently determined that the zoning ordinance of the City of Wheaton would not permit this use. The property was sold on December 1, 1957, for a net gain of $7,538.99, which was reported as long-term capital gain. The installment sales method of reporting this gain was elected, with $1,396 reported in 1957 and the balance of $6,093.29 in 1958. In the notices of deficiency issued to Thomas and Mildred, respondent determined that the gain derived from the sale of this property was properly reportable as ordinary income. The 10 acres known as the Millner Farm was not property held primarily for sale to customers in the ordinary course of a trade or business. (j) Sale of 33-Foot Parcel Located on St. Charles Road On December 3, 1958, Thomas & Associates *33 acquired certain property located on St. Charles Road west of Mannheim and east of 49th Street in Bellwood, Ill. This property was acquired at the same time the Butterfield Road property was purchased because the same individual owned both properties and would not sell them separately. A parcel containing 33 feet was sold on January 20, 1959, and the gain realized from the sale was reported as long-term capital gain of $2,503.31. In the notice of deficiency respondent determined that the gain realized from the sale of this property was properly reportable as ordinary income. The 33-foot parcel located on St. Charles Road was property held primarily for sale to customers in the ordinary course of a trade or business. Sales by Thomas Individually (k) Sale of Ryan Properties On January 2, 1940, Thomas and Howard R. Ryan (hereinafter referred to as Ryan) entered into a trust agreement known as trust No. 913, with the Prairie State Bank, Oak Park, Ill. Under the terms of this agreement title to a large number of properties was taken by the Prarie State Bank as trustee and held for Thomas and Ryan, the beneficial owners of the property. Most of these properties, which had been acquired *34 by Ryan during the depression, were encumbered with either liens for taxes or mortgages. On September 20, 1952, a letter of direction was issued to the Oak Park National Bank, which had succeeded to the Prairie State Bank, directing the trustee to deed the remaining parcels in the trust to Thomas. Among these properties was a vacant parcel of land located at 6212 West 59th Street, Chicago, Ill. This parcel had initially been acquired on August 17, 1934, and was sold February 11, 1960, for a net gain of $1,713.01, which was reported by Thomas as long-term capital gain. Another parcel of land that had been initially acquired on August 7, 1934, and was similarly in the original Ryan trust, was a vacant parcel of land located at 431 West 98th Street, Chicago, Ill. This property was sold by Thomas on December 12, 1960, for a net gain of $587.40, which was reported by Thomas as long-term capital gain. The two lots mentioned above were not held primarily for sale to customers in the ordinary course of Thomas' business. Issue 2. Deductibility of Payment Made in Settlement of Bankruptcy Controversy During the late 1920's Thomas was a stockholder and officer in Central Investment Co. *35 , a corporation primarily engaged in the mortgage business. This corporation was forced out of business during the depression and Thomas was personally liable as guarantor on one of the corporation's notes. Thomas also owned certain bank stock, and when these banks were closed during the depression he was subject to assessments for double liability as a stockholder. On July 27, 1936, Thomas filed a voluntary petition in bankruptcy and on July 31, 1936, was formally adjudicated bankrupt. In his petition in bankruptcy Thomas scheduled liabilities of $326,875.01 and stated that he had no real estate except one lot which was subsequently sold in the bankruptcy proceeding for $250. Total claims were allowed in the amount of $56,041.35. The creditors, amounts claimed, allowed, and paid in the 1936 bankruptcy proceeding of Thomas were as follows: Claim
Amount
Amount
Amount
No.
Creditor
claimed
allowed
paid
1.
Gelen Schmalzer, et al.
$ 1,026.00
$ 1,026.00
$ 0.41
2.
Barr & Collins
69.75
69.75
.03
3.
O. W. Koeber
695.17
695.17
.28
4.
L. A. Wescott
500.00
Claim expunged
5.
George Gfroerer
3,483.27
3,483.27
1.39
6.
Sinclair Refining Company
1,277.41
1,277.41
.51
7.
A. A. Kamin Screen Co.
186.50
186.50
.07
8.
O'Keefe Bros. Company
135.86
135.86
.05
9.
Greeley-Howard-Norlin
40.00
40.00
.02
Company
10.
Chicago Bank of Commerce
1,800.00
1,800.00
.72
(subsequently assigned to S.
Benson)
11.
County Collector
43.62
43.62
43.62
12.
Reclamation Corp.
$20,183.00
$20,183.00
$ 8.07
(subsequently assigned to S.
Lurie)
13.
Otis & Co.
3,191.33
3,191.33
1.28
14.
L. A. Wescott (subsequently
500.00
500.00
.20
assigned to B. Molner)
15.
Ridgeway State Bank
6,838.60
6,838.60
2.74
(subsequently assigned to R.
Feltinton)
16.
Kimbell Trust & Savings Bank
16,484.46
16,484.46
6.59
(subsequently assigned to R.
Feltinton)
17.
Westward-Ho Golf Club
130.00
130.00
.05
*36 Among the claims allowed was a claim of the Reclamation Corporation in the amount of $20,183. A dividend in the amount of $8.07 was paid, and the claim was subsequently assigned to Samuel C. Lurie (hereinafter referred to as Lurie). R. L. Feltinton (hereinafter referred to as Feltinton) was the assignee of a claim allowed in favor of Charles H. Albers, as receiver of the Kimball Trust & Savings Bank, in the amount of $16,484.46. On June 26, 1937, an order was entered discharging Thomas as bankrupt. At the time he filed the bankruptcy petition Thomas was working for William F. Pellam Co., which was engaged in liquidating certain properties. In the final liquidation Ryan bought approximately 65 to 70 parcels of real estate and ostensibly employed Thomas and Ray W. Summe (hereinafter referred to as Summe) to dispose of these properties for him. In 1948 Lurie and Feltinton filed a petition to reopen the bankruptcy proceeding on the grounds that Thomas had failed to list his interest in the Ryan properties as an asset in the schedules accompanying his petition in bankruptcy. Testimony was taken before a referee in bankruptcy and the District Court entered an order decreeing the reopening *37 of the bankruptcy proceeding, from which an appeal was taken to the United States Court of Appeals for the Seventh Circuit. The Circuit Court held the reopening of the bankruptcy proceeding proper and remanded the case for further proceedings. In 1959, pursuant to advice received from his attorney, Thomas agreed to a settlement which would dispose of all claims existing against him as a result of his failure to list these properties as assets. It was agreed that a total payment, in the amount of $25,000, would be made by Thomas over a period of years. Of this amount $2,071.97 represented costs assessed the attorneys for the claims in the bankruptcy proceeding, and the balance, $22,928.03, went to the trustee in bankruptcy to be used for payment of costs of administration and ultimate disposition to creditors. Thomas paid $13,000 in 1959, $6,000 in 1960, and $6,000 in 1961 and deducted those amounts from ordinary income during the respective taxable years. In the notice of deficiency issued to Thomas respondent determined that the deductions were not allowable under provisions of the Internal Revenue Code of 1954. Issue 3. Deductibility of Automobile and Club Expenses In the *38 taxable years in question on the partnership returns filed by Thomas & Associates, certain deductions were claimed for automobile expenses, automobile depreciation, and club dues and expenses. In the notices of deficiency issued to Thomas and Mildred, respondent disallowed one-half of these expenses on the partnership returns. Thomas estimated that approximately 25 percent of his mileage might be classified as commuter expense, and that he attended the Union League Club for business luncheons exclusively. Thomas further estimated that approximately one-fourth of the total expenses at the Union League Club would represent the cost of his own meals. Opinion The questions remaining for decision are: (1) Whether certain properties and interests in certain properties sold by petitioners during the taxable years in question constituted property held primarily for sale to customers in the ordinary course of a trade or business so that the profit therefrom was taxable as ordinary income rather than capital gain, and also whether the exchange of the St. Charles Road property for cash and 66 acres of vacant land qualifies as a nontaxable exchange pursuant to section 1031, I.R.C. *39 1954; (2) whether petitioner Richard H. Thomas is entitled to a deduction, as an ordinary and necessary business expense, for certain payments made in compromise of litigation involving the reopening of a bankruptcy proceeding in which he was the bankrupt; and (3) whether Thomas and Mildred, as members of the partnership Thomas & Associates, are entitled to a deduction for certain automobile and club expenses. Petitioners Thomas and Klarkowski reported the gain they received on the sale of lots in the Robinhood Ranch subdivision and the Glenview Woodlands subdivision in the years 1957, 1958, and 1959 as ordinary income. They assert in this proceeding that the gain should have been reported as capital gain and claim an overpayment of taxes for those years as a result thereof. Issue 1. Real Estate Transactions The governing statute with respect to the first question is section 1221, I.R.C. 1954. [2] That section provides that the term "capital asset" does not include property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Therefore it is necessary for us to decide in this proceeding whether each parcel *40 of real estate, sales of which resulted in the taxable income here involved, constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." This question is essentially factual in nature, and each case considering such a question necessarily turns upon its own peculiar facts. Raymond Bauschard, 31 T.C. 910, affd. 279 F. 2d 115. Although there is no one decisive test by which this question may be determined, see Ralph J. Oace, 39 T.C. 743, the courts have enumerated several factors which should be considered. Among these criteria which have evolved are: (1) The purpose for which the property *41 was initially acquired; (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. See John D. Riley, 37 T.C. 932, affd. 328 F. 2d 428; C. E. Mauldin, 16 T.C. 698, affd. 195 F. 2d 714; Malat v. Riddell, 347 F. 2d 23, certiorari granted 382 U.S. 900 (1965). Respondent places substantial reliance in this case upon the fact that Thomas was a licensed broker, that he was actively engaged in "the real estate business," and the purpose for acquiring the real estate involved was to realize a substantial profit on resale. Petitioners maintain, however, that little significance should be attached to the fact that Thomas held a broker's license, *42 because he has not actively engaged in the real estate brokerage business for many years. Although it is true that Thomas, as a member of the partnership Thomas & Associates, did engage actively in leasing and managing real estate properties, we do not feel this precludes Thomas from establishing that the real estate involved was purchased for investment and was not held primarily for sale to customers. See Randolph D. Rouse, 39 T.C. 70, and cases cited therein. The more difficult question, however, is whether acquisition of properties with the intention of realizing a profit on resale is of controlling significance in a case such as this. An "investor" or speculator in real estate is usually anticipating a gradual appreciation in value of the real estate, or a rather sudden increase in value in the event of fortuitous circumstances, without his doing much to cause that increase in value; whereas the dealer in real estate is typically looking for a rapid increase in price over a relatively short time, most frequently as a result of some efforts on his part to cause the increase. Unfortunately, these categories are only the extremes and do not cover the entire spectrum *43 of real estate transactions. Those that fall in between are the most difficult to characterize for tax purposes. The trier of the facts can only do his best to determine from all the evidence whether the particular property involved falls within the definition of capital assets in section 1221 of the Code, bearing in mind the purpose for which Congress granted capital gains treatment, see Burnet v. Harmel, 287 U.S. 103, 106, the language used by Congress in the statute, the fact that Congress made an effort, in section 1237 of the 1954 Code, to help solve this troublesome question under certain circumstances, [3] and the fact that each transaction must be decided on its own merits. See Eline Realty Co., 35 T.C. 1, and cases cited therein.
(a) Sale of Lots in Robinhood Ranch Development We think it is clear that Thomas and Klarkowski bought interests in the Robinhood Ranch property with the intent of choosing lots for their own homes and subdividing and improving the remainder of the property for the purpose of selling *44 the lots at a profit. Petitioners maintain that the property was initially acquired for the purpose of providing personal residences for the three partners, and that it was only later that they decided to liquidate their holding because they had obtained more land than required for that purpose. We reject that argument for several reasons, the conglomerate of which, in our opinion, paints a picture of the Robinhood Ranch partnership engaging in the real estate business. Title to the 21-acre tract was initially transferred to trust No. 2656 in 1952, with each of the three partners owning a one-third beneficial interest therein. A road was built into the property in 1953 and the land was subsequently subdivided into 27 lots. As each partner chose a lot for his personal residence, title to that lot was transferred to him individually. Had the partners bought the property initially only for personal residences it seems more likely they would each have taken title to a part thereof in his own name. The partners began selling off the riding horses and equipment soon after the property was acquired. In 1953 the partners began letting various builders, on a lot-by-lot basis, build houses *45 on the property, but title to these lots did not pass to the builders but passed directly to the homeowner-purchasers from the trust when the houses and lots were sold. In 1956 the partners agreed to let Borg & Sons, contractors, build houses on two of the lots, under plans mutually acceptable to the partners and the contractor, with the understanding that when the houses were sold the contractor would pay the partnership specified amounts for the lots. The arrangement also recited that in the event the contractor wanted to build additional houses, similar arrangements could be made with respect to other lots. Here again title to the lots usually passed directly from the trust to the homeowner-purchasers. The partnership decided to use septic tanks rather than putting in a connecting sewerline. Apparently, the partnership advanced most of the capital for development of the property. On the partnership returns for the years 1954 through 1959, sales of lots in the Robinhood subdivision were reported individually, including the entire sales price of the house and lot, less the contract and other costs, to arrive at a gross profit on each lot. For example, the 1954 return reflects *46 gross sales from five lots totaling about $148,000, contract costs of about $109,400, other costs of about $4,600, land costs of about $17,000, and gross profit on property sold of about $16,800. The partnership returns for 1954 through 1959 also described the principal business activity of the partnership as the sale of houses in subdivisions and reported the profit as ordinary income. The record does not indicate that the partnership had any other business activities. Petitioners claim that they were not actively selling this property, that they did not advertise the property for sale, and that they were selling lots only to contractors to liquidate the excess land. The evidence just does not support this claim. It is apparent that the partnership retained rather complete control over the entire project and that one of the partners, Alkire, was primarily responsible for the sale of the property. And in addition to the fact that Thomas had been connected with the real estate business on and off all his business life, it is unlikely that a subdivision of this sort required much advertising or selling activity to sell the lots. We also note that the partnership had stationery printed *47 with the letterhead "Robin Hood Ranch," "An Exclusive Development of Ranch Type Homes." We realize that we are concerned here with only 6 lots in the Robinhood subdivision which were sold during the years before us. However, there were only 10 unsold lots in this subdivision by the beginning of 1957, the partnership was then well into the Glenview Woodlands project, and we find nothing in the record to convince us that the partnership was holding these few remaining lots in Robinhood subdivision during the years in question for any purpose different from that for which they were held in the preceding years, which was primarily for sale to customers in the ordinary course of their business. Petitioner relies on several cases, all of which are distinguishable on their facts. In Wellesley A. Ayling, 32 T.C. 704, the taxpayers were required to buy the additional land in order to acquire the home they desired and they sold off the extra land in lots, rather than as a single tract as originally planned, only because circumstances demanded it. In Ralph J. Oace, supra, there was no evidence that any improvements were made on the lots. We have found as a fact *48 that the Robinhood Ranch subdivision lots sold in the years involved were held by the taxpayers primarily for sale to customers in the ordinary course of their business. (b) Sale of Lots in Glenview Woodlands (Southern Tract) In August 1955, Robinhood Ranch partnership acquired 57 acres (Glenview Woodlands) located near Glenview, Ill., 43 acres of which constituted the southern tract. Title to Glenview Woodlands was placed in trust No. 2656, and the southern tract was rezoned to accommodate residential buildings on 10,000-square-foot lots. The land was subdivided, a sewerage system was constructed, roads and other improvements were added, and an agreement was entered into with Wahrer for sale of lots in the subdivision and development of the property. Petitioners argue that the proceeds received from the 121 lots sold between 1956 and 1960 should be taxed as long-term capital gain, rather than as ordinary income. We disagree. It is apparent from the evidence that the acquisition, development, and sale of this property was a continuation of the real estate venture the partners in the Robinhood Ranch partnership had successfully become involved in at Robinhood Ranch. By the latter *49 part of 1955 the majority of the lots at Robinhood Ranch had been disposed of and it was natural for the partners to look for additional property to continue their profitable venture. Title to the Glenview Woodlands property was taken in the name of the same trust, No. 2656, and the property was subdivided and developed by the same partnership, doing business as Robinhood Building Project. It appears from the partnership returns that profits from the Robinhood Ranch project were used in the development of the southern tract of Glenview Woodlands. Considerable sums of money were spent by the partnership for improvements to this property, and most of what we said with respect to the sale of the Robinhood Ranch lots is equally applicable here. The arrangement for disposal of these lots was similar to, although not identical with, the agreement between Borg & Sons discussed above. Petitioners urge us to find that in fact there was only one purchaser of lots, and that all the lots were sold to only one purchaser, under one agreement, and were therefore not held for sale to customers in the ordinary course of business. The evidence, however, does not warrant such a conclusion. Although *50 the letter agreement dated June 27, 1956, might be construed as a contract for the sale of eight lots, it is nothing more than that. After specified improvements are made, an adjustment would be made in the selling price for the remaining lots to reflect the cost of the improvements, and Wahrer was given a first right of purchase or refusal. It is clear that the Robinhood Ranch partnership was not selling the entire block of lots at one time to one purchaser; rather, the arrangement more closely approximated a joint venture, with adjustments made in the selling price of the lots as the subdivision developed. While Wahrer did not obligate himself to purchase more than a small number of lots at any one time, it was agreed that he would continue with construction of houses in the subdivision - and the partnership apparently advanced money to assist in the development. The fact that title to individual lots was transferred directly from trust No. 2656 to the ultimate homeowner-purchaser, without ever vesting in Wahrer or his corporation, is a critical distinction between this case and the facts in W. T. Thrift, Sr., 15 T.C. 366. In Thrift we found that the sales of lots *51 were not 152 separate transactions, but rather a sale of a block of lots pursuant to an agreement between the seller and the six builders who were buying the lots. There title to the lots was actually transferred to the builders, with the seller retaining a vendor's lien secured by deed of trust. In the instant case, the sellers retained title until the lot was improved and sold, and then the property was transferred to the ultimate purchaser. The fact that Wahrer hired the salesmen is not of any controlling significance, for it is an accepted principle of law that one may conduct a business through agents, and although others may bear the burden of management, the business is nonetheless that of the principal. Walter H. Kaltreider, 28 T.C. 121, affd. 255 F. 2d 833. The continuity, number, and frequency of sales of lots in the southern tract of Glenview Woodlands, particularly when coupled with the activities of the partnership with respect to the Robinhood Ranch subdivision, is sufficient to justify a conclusion that this property was held by the taxpayers primarily for sale to customers in the ordinary course of a trade or business. We sustain respondent *52 as to this determination. (c) Sale of a One-Fourth Interest in Glenview Woodlands (Northern Tract) The northern tract of Glenview Woodlands was zoned for farming use in 1958, and, after rather extensive efforts by the Robinhood Ranch partnership, rezoning to R-4 classification was obtained in 1960. In 1962 the Robinhood Ranch partnership sold a one-fourth interest in the northern tract to Korzen, who was Klarkowski's brother-in-law. The entire tract was later sold to a third party prior to any development thereof by the partnership. This northern 14 acres was a part of the tract, the larger southern part of which was quite suitable for immediate development for residential purposes. However, the northern part was not accessible for this purpose until a road with a railroad grade crossing could be extended to it. While the partners may have had plans for ultimately developing this property, we do not believe those plans ever progressed far enough to find that this property was held by the partnership primarily for sale to customers in the ordinary course of their business. We believe it was acquired and held, posibly as a necessary adjunct to the better situated southern tract, *53 as an investment with an eye to possible appreciation in value over the long pull. The mere fact that the property was rezoned from farming to residential use does not necessarily negate petitioners' contention that the property was held for investment purposes at the time the one-fourth interest was sold to Korzen. The property was not developed while it was owned by the partnership, there were no sales of individual lots to customers, and the property was not advertised or offered for sale to the general buying public. We find for petitioners with respect to this transaction. (d) Exchange of St. Charles Road Property for 66 Acres of Vacant Land This particular issue, which only concerns Thomas individually, involves section 1031, I.R.C. 1954. [4]
*54 The property located at St. Charles Road, which was improved by a building under lease to Jewel Tea Co., is presumably conceded by both parties to be property held primarily for investment. The property received in exchange, 66 acres of farmland, was located in an area that was rapidly changing in character. Both parties agree that to the extent of the $10,000 received there is recognizable gain under section 1031(b). [5] The question presented is whether the 66 acres of farmland received in the exchange was "property of a like kind to be held * * * for investment." With respect to the exception provided in section 1031 the definition of "like kind" is stated in section 1.1031(a)-1(b), Income Tax Regs., as follows: (b). As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Unproductive *55 real estate held by one other than a dealer for future use or future realization of the increment in value is held for investment and not primarily for sale. We think it is clear that the proper test is whether the property received was acquired and to be held for investment or primarily for sale, without any requirement that the property be held for sale "to customers in the ordinary course of" a trade or business. See Ethel Black, 35 T.C. 90. Respondent argues that the subsequent acquisition of an adjoining 94-acre tract, the agreement with Markus dated June 10, 1959, for the sale of the entire 160-acre tract, and the subsequent agreement with Shannon, Turner, and Nugent establishes that the 66 acres was held primarily for sale. Petitioner Thomas maintains that the property was acquired primarily for investment purposes, that the property was held for 6 years after the exchange, and was then sold in bulk by metes and bounds description. [6]
*56 This issue is not entirely free from doubt, but we do not believe petitioner has carried his burden of proving that the property received in the transaction by Thomas was property of a like kind (to that exchanged) to be held for investment. The critical point of time here is the time when the exchange took place. While a taxpayer's purpose in holding property may change so the nature or character of the property for tax purposes may be different at the time of sale than its nature or character at the time it was acquired, under this statute we think the purpose for which the property was acquired is of major importance. Here, too, we believe this 66 acres of vacant land, lying not far to the north of Glenview Woodlands, was acquired by the partnership to carry on the real estate venture the partners had started with Robinhood Ranch and continued to pursue at Glenview Woodlands, with Korzen substituted for Alkire as the third partner. This was not, as petitioners would have us believe, a separate venture by Thomas individually. On October 31, 1958, Thomas, Klarkowski, and Korzen entered into an agreement under the name of Glendale Developers in which Thomas was given a power *57 of attorney to negotiate for the purchase of the Wentcher 66 acres at a price not to exceed $205,000. The property was to be purchased in the name of the Oak Park National Bank, as trustee of a trust in which each of the three partners was to have an equal interest; and each was to pay one-third of the purchase price. The plans apparently changed somewhat because the property was transferred to a newly established trust, No. 4560, and Thomas was credited with the net value of the real estate he exchanged, but each of the three partners assumed one-third of the mortgage on the St. Charles Road property and each was credited with that amount on the partnership books. The partnership returns also reflect that each partner shared equally in the profits and losses and each partner was credited with one-third of the total gain from the sale of a two-thirds interest in the property, as subsequently discussed. On the other hand the exchange agreement between Thomas and Wentcher was not executed until November 12, 1958. Soon after the 66 acres were transferred to trust No. 4560, the partnership purchased, on June 5, 1959, an adjoining 94 acres of land for $233,500; and almost immediately *58 thereafter the partnership entered into an agreement to sell the entire 160 acres to Markus, a contractor, provided the property could be rezoned from R-3 to R-4 so Markus could develop it as 10,000-square-foot lots rather than 20,000-square-foot lots. Thomas claims he acquired the 66 acres as an investment. No explanation is given why he would exchange improved income-producing property for nonincome-producing vacant land, under the partnership arrangement set out above, if investment was his primary purpose in acquiring the 66 acres - unless he planned to resell the property received in the immediate future so he could liquidate his investment and realize a profit as well. All three of the partners claim that the entire 160-acre tract was originally planned to be used as a semipublic golf course. However, there is no evidence that any of them ever had any experience in laying out or operating golf courses, or that any steps were ever taken in that direction. Furthermore, they must have known that developing a golf course would be a very expensive proposition and yet they testified that they were unable to carry the mortgage incurred to purchase the land itself. On the record, *59 we are not convinced that Thomas acquired the 66 acres primarily to hold it as an investment. Instead we believe that at the time Thomas acquired the property he intended to liquidate his investment in the real estate and held the property received primarily for sale. See Ethel Black, supra; Regals Realty Co. v. Commissioner, 127 F. 2d 931. Consequently, the transaction in which Thomas exchanged investment property for the 66 acres of vacant land does not qualify as a nontaxable exchange under section 1031. We hold for respondent on this issue. (e) Sale of a Two-Thirds Interest in the 160 Acres Located in Glenview, Ill. On May 31, 1960, shortly after the contract to sell the 160 acres to Markus had been canceled because the rezoning application had been turned down, trust No. 4560, in which Thomas, Klarkowski, and Korzen were equal beneficial owners, agreed to sell the 160-acre tract referred to in the immediately preceding discussion, to Thomas, Klarkowski, Korzen, Shannon, Turner, and Nugent for $720,000, the option price to Markus, payable over 3 years. On the same day the buyers created a new trust at the LaSalle National Bank of Chicago to take title *60 to the property. Shannon was to have a one-third interest in the trust, Turner and Nugent a one-sixth interest each, and Thomas, Klarkowski, and Korzen a one-ninth interest each, and each was to pay a like share of the purchase price for the property. As indicated by our findings of fact the effect of this transaction was to carry out an agreement whereby the partnership of Thomas, Klarkowski, and Korzen, doing business as Glendale Developers, was to sell a two-thirds interest in the 160-acre tract to Shannon, Turner, and Nugent. The property was never developed by the six beneficial owners and no individual lots were sold therefrom during the years before us; consequently, the only issue before us is whether the gain realized on the sale of the two-thirds interest by Glendale Developers was capital gain, as reported by the partnership, or ordinary income, as determined by respondent. We hold for petitioners on this issue. As indicated in our discussion of the preceding issue, we believe the partners acquired this property primarily for sale. However, we do not believe they were able to develop the property to the point where it could be said they were holding the property primarily *61 for sale to customers in the ordinary course of their business of subdividing and selling real estate; and certainly we do not believe this transaction was a sale of the property, or an interest therein, to a customer in the ordinary course of their business. Whether this transaction was a sale of an interest in property or a sale of a partnership interest makes little difference for our purposes, because even if it were considered a sale of a partnership interest which might normally be taxable as a capital gain under section 741, the exception in section 741 is "except as otherwise provided in section 751"; and section 751 provides that the amount of money received on sale of a partnership interest attributable to inventory items of the partnership which have appreciated substantially in value shall be considered as an amount realized from the sale of other than a capital asset. "Inventory items" are defined in section 751(d)(2)(A) as property of the partnership of the kind described in section 1221 (1). Thus the answer depends on whether the property sold was property held by the taxpayer primarily for sale to customers in the ordinary course of his business, as set forth in section *62 1221(1). In any event the effect of the transaction was the sale of a two-thirds interest in this property to the Shannon group. While Glendale Developers, as such, had never previously sold any real estate, we might assume, because of the common identity of two of the three partners, that this partnership purchased this property for the same purpose the Robinhood Ranch partnership purchased the Robinhood and Glendale Woodlands properties, that is to subdivide the property and sell it as residential lots. But, if so, they were never able to accomplish this purpose because of the rezoning difficulties and the fact that the property could not be developed advantageously as R-3 property. As a result they had to change their plans. However, the arrangement with Markus, or possibly the combination of the 66 acres and the 94 acres into one tract, had apparently raised the value of the property considerably, even as undeveloped land, because the option price to Markus was the basis for the price to the Shannon group. But under the circumstances that existed in 1960 it seems apparent that Glendale Developers was holding the property more for investment or speculation than for subdividing *63 and sale. This was the only real estate transaction, or business activity of any kind, engaged in by Glendale Developers during the years before us, except for renting the Holtse Farm, which apparently was a part of the 160-acre tract. While admittedly this one transaction provided a substantial profit to Glendale Developers, this factor alone does not prove that the property was held primarily for sale to customers in the ordinary course of their business. Nor do the efforts on the part of the partners to have the property rezoned; rezoning alone does not constitute a real estate business, and the failure of their efforts to rezone the property could hardly have been of benefit in selling the two-thirds interest in the property. Furthermore, so far as the record shows, Glendale Developers made no effort to advertise the property for sale or hold it out for sale to the general public. Sales by Thomas & Associates
Thomas & Associates was a partnership formed in 1942, in which Thomas and Mildred were equal partners. The partnership engaged in various activities, including real estate management, selling insurance and real estate on a commission basis, buying real estate for investment *64 purposes, and buying real estate for resale at a profit. It appears from the partnership returns of income that the real estate management and commission business usually operated at a loss but profits were made on the purchase and resale of real estate, usually vacant land, despite the fact that there is very little evidence of any of the usual efforts made by real estate dealers to sell property, such as subdividing and improving the property and advertising it for sale. Mildred was apparently the more active partner, as Thomas was engaged in several other businesses on a salary basis, as well as his activities with Klarkowski, Alkire, and Korzen. On the evidence presented it would appear that, with respect to buying and selling real estate on its own account, Thomas & Associates had two purposes in mind, i.e., buying real estate and holding it for appreciation in value, which could be termed investment or speculation; and also buying real estate for rather immediate resale to customers at a profit. While we think that sufficient activity in the two fields could result in making both of such activities the conduct of the real estate business as a dealer, so that all properties *65 bought and sold could be characterized as property held primarily for sale to customers in the ordinary course of business, except for such properties as could clearly be shown to be held for investment, see Malat v. Riddell, supra; compare Municipal Bond Corp. v. Commissioner, 341 F. 2d 683, reversing 41 T.C. 20, we do not think that is the situation here. Consequently, arduous and uncertain as the task may be, we feel we must examine each transaction in issue before us and decide from the evidence before us whether the particular property was held for investment or primarily for sale to customers. We have taken all the criteria heretofore mentioned into consideration in reaching our conclusions. These being primarily factual issues, our conclusions with respect to each property are stated in our Findings of Fact, and we mention below only those factors which we deemed to be of some particular significance with respect to each property. (f) Sale of Mobile Avenue Lot Thomas & Associates purchased the Mobile Avenue lot in August 1956, as part of an effort to assemble a city block for the purpose of acquiring a site for the construction of *66 a supermarket. An obstacle was encountered which prevented completion of the contemplated acquisition, and the lot was sold in March 1957. The evidence does not establish that this property was held primarily for sale to customers in the ordinary course of a trade or business, but rather that the initial purpose for acquiring this parcel was frustrated by subsequent events. Although we recognize that here, as is true in all of these transactions, the purpose for which the property is held at the time of sale is of substantial importance, we also believe that the purpose for which the property was initially acquired must also be considered. Under the circumstances, we believe the evidence supports a finding that the property was not held primarily for sale to customers, and we find for petitioners on this issue. (g) Sale of Six Lots Located on Butterfield Road The six lots located on Butterfield Road were purchased initially with the intention that they would be used as a site for a supermarket which Thomas & Associates would lease to the Jewel Tea Co. Subsequently, it was decided to locate the store in another neighborhood, and the six lots were held for over 2 years when they *67 were sold to an oil company. We think the evidence clearly establishes that this property was held for investment rather than for sale to customers in the ordinary course of a trade or business. Respondent emphasizes that Thomas & Associates frequently operated at a loss in its property management and leasing business, but realized substantial gains in the purchase and sale of real estate. Although we believe that this is one factor to be considered, we do not believe it is determinative of the ultimate factual question presented. Even if it is established that Thomas & Associates was in the real estate business, that does not mean that all the property held by the partnership constituted property held primarily for sale to customers in the ordinary course of a trade or business. Randolph D. Rouse, supra. Here petitioners have established that the parcels were purchased for an investment purpose, and then subsequent events prevented use of these particular lots for that purpose. We do not feel that abandonment of this originally intended use requires a finding that the property was no longer held for investment. The subsequent sale of these lots appears to be nothing *68 more than the liquidation of property held for investment, and we find for petitioners on this issue. (h) Sale of Washington Boulevard Property Petitioners maintain that the Washington Boulevard property was acquired with the plan that it would be used as a site for an apartment building, but that this idea was subsequently abandoned. We note that this parcel was not actively advertised for sale, no "For Sale" signs were placed on the property, and it was sold only after a broker asked Thomas if the property was available. Although the issue as to this parcel is not entirely free from doubt, we believe the evidence supports the view that the property was not held primarily for sale to customers in the ordinary course of a trade or business, and we find for petitioners on this issue. (i) Sale of 10 Acres Known As Millner Farm Thomas apparently acquired the Millner Farm for his own personal use, although he was prevented from using the land for raising Shetland ponies because of a local zoning ordinance. We believe the evidence establishes that Thomas felt this property was attractively priced for investment purposes, and that he felt it would increase in value in time. *69 The Millner Farm was sold nearly 3 years later for a net gain of $7,538.99, which was reported on the installment method. The Millner Farm was not held primarily for sale to customers in the ordinary course of a trade or business, and we find for petitioners on this issue. (j) Sale of 33-Foot Parcel Located on St. Charles Road The evidence presented establishes that Thomas & Associates purchased this property because the owner of the Butterfield Road property, who owned both parcels, would not sell them separately. While the partnership may have been required to buy this property to acquire the Butterfield Road property, there is no evidence that it intended to do anything with this property except resell it as soon as possible. This was property bought and held primarily for sale to customers in the ordinary course of the partnership business. We hold for respondent on this issue. (k) Sale of Ryan Properties - Thomas Individually The two properties here involved were two of numerous lots purchased initially by Ryan during the depression. The lots remaining in 1952 were transferred to Thomas, and he subsequently liquidated them gradually over a period of years. The properties *70 were not held primarily for sale to customers in the ordinary course of a trade or business, but rather were held as investment properties gradually being liquidated by Thomas. We find for petitioners on this issue. Issue 2. Deductibility of Payment Made in Settlement of Bankruptcy Controversy The question presented here is whether Thomas is entitled to a deduction, as an ordinary and necessary business expense, for payments of $13,000, $6,000, and $6,000 made in 1959, 1960, and 1961, respectively, in compromise of litigation involving the reopening of a bankruptcy proceeding in which he was the bankrupt. By stipulation the parties agreed that respondent's determination as to the deductibility of the $2,071.97 payment made in 1959 was incorrect, but the remainder of these payments remained in issue. Briefly stated, the facts reveal that Thomas filed a voluntary petition in bankruptcy in 1936, and he listed only one lot as an asset. Total claims in excess of $56,000 were allowed, and Thomas was subsequently discharged in 1937. Later two assignees of creditors filed a petition alleging that Thomas failed to schedule certain properties in which he had an interest as an asset, and *71 their plea that the bankruptcy proceeding be reopened was granted; an appeal was taken and the Circuit Court of Appeals upheld the propriety of reopening the bankruptcy proceeding. Acting upon the advice of counsel, Thomas entered into an agreement compromising this litigation. Thomas agreed to pay $25,000 over a 3-year period, and his deduction of these payments from gross income was disallowed by respondent. Respondent contends that Thomas has failed to carry the burden of proof on this issue. Specifically, respondent asserts that Thomas has failed to show that the payments made were other than repayments of moneys borrowed in prior years. Respondent also maintains that if the creditors' claims originated because Thomas guaranteed the payment of a loan of another, it has not been shown that restitution of the payment was not made or that the debt owing Thomas became worthless in the years before the Court. Thomas argues that these payments are deductible for two reasons: (1) They are in effect payment of the debts which initially forced him into bankruptcy, and since he received no tax benefit from any of those debts in prior years, being a cash basis taxpayer, he is entitled *72 to deduct them in the year paid, and (2) that the payments are deductible under section 1341, I.R.C. 1954. We agree with respondent that Thomas has failed to establish that he is entitled to a deduction for these payments. The glaring defect in Thomas' first argument is that he has not shown that he would have been entitled to deduct any of the debts regardless of when they were paid, nor has he shown that any of the payments were applied to any particular debt. Most of the claims filed against Thomas in the 1936 bankruptcy proceeding appear to be for personal debts owed by him, the payment of which would not be deductible without some showing of business connection or other grounds for deduction. The largest claim filed was for $20,183 which Thomas testified resulted from his guarantee of a note executed by Central Investment Co., a corporation in which he was an officer. But there is no evidence that Thomas did not receive restitution from his cosigners or from the corporate assets; and certainly there is no evidence that this would have been a business bad debt of Thomas'. The second largest claim appears to have arisen out of a loan to Thomas by a bank. *73 There is no evidence of how the proceeds of the loan were used. We have been unable to ascertain that any of the claims were business connected in such a way that would have allowed Thomas a deduction upon payment of them at any time. Furthermore, there is no evidence that Thomas' payments in the years here involved were applied to any of those claims.
Petitioners' second argument that section 1341[7] provides relief must similarly fail for lack of proof. That section generally provides the method for computation of tax where the taxpayer restores a substantial amount held under claim of right. The only evidence presented in support of this argument was the self-serving testimony of Thomas to the effect that he had reported income in excess of $116,000 over the period from 1935 to 1952. Thomas failed to introduce any evidence that would substantiate this amount, nor any evidence as to how much of this amount actually was gain, nor any evidence to show that the $25,000 he paid to the trustee in bankruptcy was a repayment of amounts he had reported as income in the past. Even if we were satisfied that Thomas had indeed earned and reported this income in prior taxable years, we would *74 still face the problem that it was the old debts, rather than the income received, that Thomas was obliged to repay. We sustain respondent on this issue. *75 Issue 3. Deductibility of Automobile and Club Expenses Respondent disallowed one-half of the automobile expenses, automobile depreciation, and club dues and expenses claimed on the partnership returns filed by Thomas & Associates during the taxable years in question. No convincing evidence was offered by petitioners that these items were connected with a trade or business conducted by petitioners Thomas and Mildred. Thomas admitted that approximately 25 percent of his mileage might properly be classified as commuter expense, and therefore would be nondeductible. But there was no proof that the remaining expenses were connected with business; furthermore, no effort was made to substantiate the amounts claimed. Apparently Thomas occasionally visited the Union League Club for luncheon, and this was the reason for deducting the Union League Club dues and expenses. Again there was an estimate by Thomas that 25 percent of the total expenses would represent the cost of his own meals. We would need more convincing proof as to the actual amounts expended and the reasons therefor in order to find that respondent's disallowance of one-half the claimed expenses was not proper. Under the *76 circumstances, respondent's allowance of one-half the claimed expenses appears to be reasonable, and we sustain respondent on this issue. No evidence was presented by either respondent or petitioners as to certain issues raised in the pleadings and not already specifically referred to above, and these issues are deemed to have been abandoned by petitioners. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Richard H. Thomas and Estate of Mary S. Thomas, Deceased, Richard H. Thomas, Executor, docket Nos. 3779-62, 436-65; Mildred D. Hall, docket Nos. 3780-62, 438-65; Stanley H. Klarkowski and Estate of Susan Klarkowski, Deceased, Richard H. Thomas, Executor, docket No. 437-65; and Bernard J. Korzen and Loretta Korzen, docket No. 439-65.↩
1. Sum of year's digits method was 20-year life. The parties have stipulated that the proper life from date of completion is 30 years.↩
1. A share of the profits on the sales of some of the real estate reported on the partnership returns was paid to Ray W. Summe and deducted from the profits reported by the partnership. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
[2] Includes $9,644.74 short-term capital gain realized from the purchase and sale of 12 lots sold in one transaction to one buyer. Neither party refers to section 1237 in the briefs so we will assume that they are in agreement that the section is not applicable.
[3] Does not include $740.93 short-term capital loss realized from the purchase and sale of 50 feet of vacant land located on St. Charles Road. SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT. (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. (b) Gain From Exchanges Not Solely in Kind. - If an exchange would be within the provisions of subsection (a), * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
[4]↩ Does not include $680.52 short-term capital gain realized from the purchase and sale of 100 shares of Aqua Chemical Co.
5. See fn. 4.↩
6. The agreement for exchange between Thomas and Wentcher was dated November 12, 1958. Title to the 66 acres was transferred to trust No. 4560 on February 13, 1959. The record is not clear as to when the actual exchange between Thomas and Wentcher took place.↩
7. SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT. (a) General Rule. - If - (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item; (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and (3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following: (4) the tax for the taxable year computed with such deduction; or (5) an amount equal to - (A) the tax for the taxable year computed without such deduction, minus (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).↩